Filing # 26193460 E-Filed 04/16/2015 04:13:56 PM

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL DISTRICT
IN AND FOR ORANGE COUNTY, FLORIDA

| ERICA KINSMAN, | Case No.: 2015-CA-_____-O |
|---|---|
| Plaintiff, | Division: |
| v. | |
| JAMEIS WINSTON, | JURY TRIAL DEMANDED |
| Defendant. | |

## COMPLAINT

Plaintiff Erica Kinsman ("Plaintiff") sues Defendant Jameis Winston ("Defendant" or "Winston"), and pursuant to Rule 1.110(b), Florida Rules of Civil Procedure, alleges:

### Overview

1. This is an action for (i) sexual battery, (ii) assault, (iii) false imprisonment, and (iv) intentional infliction of emotional distress arising out of forcible rape.

### Jurisdiction, Parties & Venue

2. The Court has subject matter jurisdiction pursuant to FLA. STAT. §§ 26.012(2) and 34.01(c) inasmuch as the matter in controversy – including monetary damages and other relief sought by Plaintiff – exceeds $15,000.00, exclusive of interest, costs and attorneys' fees.

3. Plaintiff is an individual who resides in the State of the Florida.

4. Defendant is an individual who committed tortious acts within the State of Florida and, upon information and belief, currently resides in the State of Alabama.

5. The Court has personal jurisdiction over Defendant pursuant to FLA. STAT. § 48.193(1)(a) because Defendant committed tortious acts within the State of Florida.

6. Venue is proper in Orange County, Florida inasmuch as Defendant is a non-resident of the State of Florida and has substantial contacts with the State of Florida.

7. All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred, been performed or have otherwise been waived.

## GENERAL ALLEGATIONS

### *Summary*

8. On December 7, 2012, Plaintiff, then a freshman at Florida State University ("FSU"), was raped in a Tallahassee, Florida apartment. At the time, she did not know the identity of her assailant.

9. Immediately after the rape, Plaintiff cried out on social media asking her group of friends to help her. One such friend got word to Plaintiff's parents and another friend immediately drove to Plaintiff's dorm room and assisted in calling the police. FSU Police responded and Plaintiff described being sexually assaulted by an unknown male at an apartment building. Roughly two hours after the rape, Plaintiff was transported to Tallahassee Memorial Hospital, where she was examined and treated for vaginal trauma and other injuries inflicted during the rape. The investigation was turned over to Detective Scott Angulo of the Tallahassee Police Department ("Tallahassee Police").

10. On January 10, 2013, as the spring semester began, Plaintiff recognized her assailant on the first day of a class in which they were both enrolled. Plaintiff listened for his name during roll call and promptly provided it to the Tallahassee Police: Jameis Winston.

11. Unbeknownst to Plaintiff at the time, Winston was FSU's premier freshman football recruit. Although he was not yet playing football during his "redshirt" freshman year, Winston was expected by the football program to start as quarterback in the fall of 2013.

12. On January 22, 2013, the FSU Athletics Department was in contact with the Tallahassee Police and learned that Winston had been identified as the suspect in Plaintiff's violent sexual assault. High-ranking members of the football department met with Winston and his lawyer, whom FSU officials arranged for Winston, to discuss the rape accusations.

13. On October 25, 2013, Plaintiff's victim advocate at FSU informed her that a second woman had come forward and reported being sexually assaulted by Winston.

14. In November 2013, the rape investigation of Winston was leaked to the media and widely reported. Winston had by then become a national college football celebrity, and FSU appeared to be on course for a national championship.

15. Both in January and November 2013, Winston refused Tallahassee Police requests for interviews.

16. Shortly after winning the 2014 BCS National Championship game, FSU conducted a cursory investigation of Winston regarding the rape accusation for the first time. Winston again refused to answer any questions.

17. At a December 2014 university disciplinary hearing, when asked under oath what Plaintiff did and said to express consent to having sex with him, Winston indicated only that Plaintiff "moaned" and refused to answer all other questions.

### *An Evening at Potbelly's Bar*

18. In the fall of 2012, Plaintiff was a first semester freshman at FSU's Tallahassee campus. She had dreamed of attending FSU for many years and was excited to see that dream come true. She pledged a sorority which she loved and was very much enjoying being a new student at her chosen school.

19. On the evening of December 6, 2012, Plaintiff went to Potbelly's, a local bar near campus, with two friends. A loud crowd of hundreds of FSU students milled around several dance and drinking areas.

20. Unbeknownst to Plaintiff, in the crowd was another FSU freshman named Jameis Winston from Bessemer, Alabama, who had been recently recruited to play football for FSU. As of December 2012, Winston had not yet played college football and was not well known on campus.

21. Plaintiff and her friends socialized, danced and consumed alcoholic beverages that her friend Marcus purchased. At one point, Plaintiff was approached by a man who identified himself as "Chris." She would later learn that "Chris" was Chris Casher, a friend of Winston and a defensive end for the FSU football team.

22. As Plaintiff passed one of Potbelly's bar areas, a man she did not know – who she believes to have been Winston – offered Plaintiff a shot of an unknown liquor, which she consumed. Sometime later, Plaintiff found herself on the sidewalk in front of Potbelly's separated from her friends in the presence of three men. At the time, she did not realize that one of the men was the same "Chris" who had approached her, and that another was the man who had given her the shot. Plaintiff texted her friend Monique "[c]ome find me" because she was growing increasingly uncomfortable and afraid.

23. The men hailed a taxicab and Plaintiff was led inside.

24. The cab driver observed that Plaintiff appeared to be impaired.

25. Plaintiff had no idea where the cab was going, who the men were, or what they planned to do. The man seated next to her, later identified as Winston, kept touching and

fondling her. Plaintiff pushed him away and told him to stop as she became increasingly panicked. She called her friend Monique twice for help but she did not answer.

### *Plaintiff is Raped in Defendant's Apartment*

26. After the cab stopped, Plaintiff was taken by the arm and led into the Legacy Suites Apartments by the man who had been fondling her – Winston.

27. Winston took Plaintiff into a first floor apartment and directly into his bedroom. He then stripped Plaintiff of her clothes, pushed her on his bed, and began forcefully raping Plaintiff in her vagina.

28. Plaintiff lay frozen with fear. She said "no, no" and "please stop" over and over, and resisted his efforts to roll her over, but Winston continued.

29. The other two men from the cab, who would later be identified as Casher and Darby, initially remained outside Winston's unlocked bedroom watching Winston rape Plaintiff.

30. Casher then stepped into the room and began filming the rape on his cellphone. Casher would later admit that he wanted to "join in," as he and Winston had apparently done to other women before when they would "run them."[1]

31. Darby also entered the room but told Winston, "Dude, she is telling you to stop." For a brief moment, Plaintiff thought her nightmare might be over. Instead, Winston picked her up in a fireman's carry, walked her into his bathroom, deposited her onto the hard floor and locked the door.

32. Darby then left the apartment. The next day, he posted to his Facebook page, "I feel the worst I almost felt in my life Smh [shaking my head] # stupid."

33. In the bathroom, Winston resumed raping Plaintiff. She resisted, repeatedly telling him "no" and "stop," and tried to fight him off. But Winston grabbed her arms and legs,

---

[1] "Running them" or "running a train" is grotesque slang for gang rape.

pinning her hard against the floor, and continued to thrust. To stop her protests and block her view of him, Winston covered Plaintiff's face with a hand and jammed her head to the side as the thrusts continued.

34. Plaintiff continued to try to push and kick Winston off but he was much too strong. Eventually the assault ended. Winston picked Plaintiff up from the bathroom floor and carried her back to the bed where she lay in shock, unable to dress herself. Winston put her clothes on and told her to leave but she did not know where she was.

35. Winston, apparently realizing that Plaintiff did not know where she was, took Plaintiff out of his apartment, put her on his scooter and asked Plaintiff where she lived. Plaintiff gave him a false address. As Winston drove her there, Plaintiff sat behind, forced to hold on and horrified by having to grasp the body of the man who had just raped her. Winston left Plaintiff at an intersection and disappeared around a corner.

### *Plaintiff Cries Out for Help Over Social Media*

36. Plaintiff stood overcome by trauma and sobbing in the street. She did not know who to call for help but she knew that if she sent a Tweet, multiple close friends would see it and someone would respond. She tweeted, "SOMEONE HELP ME."

37. Plaintiff's high school friend Bria Henry ("Bria") called almost immediately, at 2:48 a.m. on December 7, 2012, while Plaintiff was still alone in the street. Plaintiff was crying uncontrollably and Bria had to repeatedly ask what happened to understand that Plaintiff had been raped. Bria told Plaintiff that she needed to call her parents right away and Plaintiff began walking the short distance to her dorm.

38. Immediately after speaking with Bria, Plaintiff's friend Jenna Weisberg ("Jenna") called her. Jenna told Plaintiff that she was coming right over to Plaintiff's dorm. She kept

talking with Plaintiff the entire way as she drove, giving reassurances block by block that she would soon be there. Upon arrival, Jenna found Plaintiff still crying uncontrollably. Jenna called the police at 3:22 a.m. and reported that her friend had just been raped by an unknown assailant. FSU Police responded six minutes later.

39. Before FSU Police Officer Dinorah Harris ("FSU Officer Harris") arrived, Plaintiff got a phone call from her mother. Bria had contacted her former high school cheerleading coach who had called Plaintiff's parents. Plaintiff, still crying, told her mother and father what had happened that night. They told her they were leaving immediately and would be there in four hours or less.

40. Meanwhile, FSU Officer Harris arrived and interviewed Plaintiff, who began to provide detailed information about the incident. At the time, however, Plaintiff did not know the identity of her assailant.

41. FSU Officer Harris transported Plaintiff to Tallahassee Memorial Hospital for a Sexual Assault Nurse Examination ("S.A.N.E."). The criminal case investigation was turned over to the Tallahassee Police, who interviewed Plaintiff twice that day.

42. During his interview with Plaintiff at the hospital roughly two hours after the rape, Tallahassee Police Officer Clayton Fallis noted that "[s]everal bruises began to appear" on Plaintiff.

43. At the hospital, Plaintiff was met by FSU victim advocate Sarah Groff at 4:09 a.m. They were soon joined by rape crisis victim's advocate Angela Chatfield, who noted that, based on her experience and training, Plaintiff appeared to be in a dissociated state and was traumatized.

44. The hospital findings included bruises on Plaintiff's arms and legs. The pelvic exam confirmed vaginal tenderness and redness. The sexual assault information sheet accompanying Plaintiff's hospital chart stated, "[U]nknown PERP[.] States held down by arms + legs. Now [with] generalized muscle aches and vaginal tenderness. Now [with] H[eadache] and nausea. . . ." The hospital chart further recorded that Plaintiff was "[s]aying no and resisting. . . . Hi[gh] severity and urgent."

### *Plaintiff Identifies Her Assailant as Winston*

45. Just over one month after she was raped, at the start of the next semester, on January 10, 2013, Plaintiff appeared for the first day of a course entitled "Race and Ethnicity." Sitting in the front of the room, she turned around to look for a friend and was shocked to see her attacker in the classroom. She listened until his name was called during the roll call and wrote it down.

46. Shortly after class, Plaintiff called and left a voice message for Detective Angulo at the Tallahassee Police in which she identified her assailant: "His name is Jameis Winston."

47. Subsequent to this identification, Winston was further identified by DNA as Plaintiff's assailant.

### COUNT I – SEXUAL BATTERY

48. Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 – 47 above.

49. Without privilege or consent, Defendant intentionally caused offensive and harmful contacts with Plaintiff's person by removing Plaintiff's clothing, holding Plaintiff down, and forcibly raping Plaintiff in the vagina with his penis.

50. Defendant acted with the intent to cause the foregoing offensive and harmful contacts, against Plaintiff's will and despite her protests and physical resistance.

51. As the direct and proximate result of Defendant's offensive and harmful contacts, Plaintiff has suffered injuries, damages, and losses – including, without limitation, past and future physical injury, pain, and suffering; past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**WHEREFORE**, Plaintiff respectively demands judgment against Defendant for money damages in excess of $15,000, costs, and such other and further relief as the Court may deem just and proper.

## COUNT II – ASSAULT

52. Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 – 47 above.

53. Before and during the course of forcibly raping Plaintiff, Defendant intentionally threatened immediate harmful contacts with Plaintiff's person by use of his hands, arms and other body parts.

54. Defendant intentionally caused or acted with a reckless disregard of causing Plaintiff to fear that such threatened contacts put her in imminent peril and that, in light of his size, strength and surroundings, Defendant had the present ability to carry them out.

55. Plaintiff readily apprehended these threatened contacts, which created a well-founded fear that sexual and other violence to her person was about to take place.

56. As the direct and proximate result of Defendant's threatened contacts, Plaintiff has suffered injuries, damages, and losses – including, without limitation, past and future

physical injury, pain, and suffering; past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

### COUNT III – FALSE IMPRISONMENT

57. Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 – 47 above.

58. Without privilege or authority, Defendant intentionally and physically restrained and confined Plaintiff by use of his hands, arms and other body parts for the purpose of and with the knowledge that his actions would result in Plaintiff being confined and restrained in, among other places, his bedroom and bathroom.

59. Defendant acted with the intent to restrain and deprive Plaintiff of her liberty, against Plaintiff's will and despite her protests and physical resistance.

60. Throughout Defendant's restraint and confinement of her person, Plaintiff had no reasonable means or avenue of escape.

61. Plaintiff in no way consented to being so restrained or confined by Defendant.

62. Defendant's acts of restraining and confining Plaintiff were wholly without authority and completely unreasonable in light of the foregoing facts and circumstances.

63. As the direct and proximate result of Defendant's unlawful restraint and deprivation of her liberty, Plaintiff has suffered injuries, damages, and losses – including, without limitation, past and future physical injury, pain, and suffering; past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**WHEREFORE**, Plaintiff respectively demands judgment against Defendant for money damages in excess of $15,000, costs, and such other and further relief as the Court may deem just and proper.

### COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

64. Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 – 47 above.

65. In forcibly raping Plaintiff, Defendant intentionally caused or acted with a reckless disregard of causing Plaintiff to suffer severe mental anguish and suffering.

66. Defendant's conduct and actions in forcibly raping Plaintiff went beyond all possible bounds of decency and was shocking, atrocious and utterly intolerable in a civilized society.

67. Defendant's aforementioned conduct was extreme and outrageous and caused Plaintiff to suffer severe mental anguish and suffering, including, more specifically, loss of sleep, flashbacks, severe anxiety, fear of repeat sexual violence, an unfounded sense of shame and depression, all of which will continue to require psychological and other counseling.

68. As the direct and proximate result of Defendant's intentional or reckless infliction of emotional distress, Plaintiff has suffered injuries, damages, and losses – including, without limitation, past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**WHEREFORE**, Plaintiff respectively demands judgment against Defendant for money damages in excess of $15,000, costs, and such other and further relief as the Court may deem just and proper.

## PUNITIVE DAMAGES

Plaintiff reserves the right to seek leave as to her entitlement to punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury as to all matters so triable.

Dated: April 16, 2015

Respectfully submitted,

/s/ David B. King
David B. King
Florida Bar No.: 0093426
Thomas A. Zehnder
Florida Bar No.: 0063274
Taylor F. Ford
Florida Bar No.: 0041008
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
dking@kbzwlaw.com (Primary)
tzehnder@kbzwlaw.com (Primary)
tford@kbzwlaw.com (Primary)
aprice@kbzwlaw.com (Secondary)
courtfilings@kbzwlaw.com (Secondary)

Baine Kerr*
Colorado Bar No.: 9797
John Clune*
Colorado Bar No.: 27684
Lauren E. Groth*
Colorado Bar No.: 47413
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone: (303) 442-6514
Facsimile: (303) 442-6593
kerr@hbcboulder.com (Primary)
clune@hbcboulder.com (Primary)
groth@hbcboulder.com (Primary)

*(Motions to appear pro hac vice forthcoming)

*Counsel for Plaintiff*