**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| ERICA KINSMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 6:15-cv-00696-ACC-GJK |
| v. | ) | |
| | ) | |
| JAMEIS WINSTON, | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND DEMAND FOR JURY TRIAL

### PRELIMINARY STATEMENT

Jameis Winston did not rape Erica Kinsman.

Ms. Kinsman has told many different and inconsistent accounts of her sexual encounter with Mr. Winston on the evening of December 6, 2012 and the morning of December 7, 2012. Indeed, the Tallahassee Police Department ("TPD"), Florida State's attorney's investigation ("State Attorney"), the hearings in Florida State University's ("FSU") Code of Conduct hearing for Ronald Darby and Christopher Casher, the Code of Conduct hearing for Mr. Winston, and Dr. Allison Crume, the Appellate Officer who presided over Ms. Kinsman's appeal of the favorable ruling in Mr. Winston's Code of Conduct hearing, have all considered Ms. Kinsman's story and rejected it. **Ms. Kinsman is 0 for 6.**

However, Ms. Kinsman has been successful in one major area. She has mounted a false and vicious media campaign to vilify Mr. Winston with the objective of getting him to

pay her to go away.  Ms. Kinsman is motivated by the most insidious objectives—greed.

Ms. Kinsman abused administrative proceedings and obstructed criminal investigations to

construct a false tale, upon which she intends to rely in this action against Mr. Winston.

Some of Ms. Kinsman's false statements are specifically designed to rebut well-

established facts relating to:

- Ms. Kinsman's choice to leave Potbelly's on December 7, 2012;

- the lack of any outcry prior to entering the taxicab, inside the taxicab, or upon exiting the taxicab;

- the consensual sexual encounter that was witnessed by two of Mr. Winston's teammates;

- Ms. Kinsman's ride on Mr. Winston's motor scooter with her arms wrapped around her alleged assailant's waist after her alleged rape;

- the absence of any outcry evidence—no call to 911, no call or text to family or friends;

- Ms. Kinsman's texts immediately following her alleged rape, from 1:46 a.m. to 2:37 a.m., in which Ms. Kinsman asked about her school identification card and then asked another friend for the answers to the next day's tests in a class; none of these texts mentioned an alleged rape or any untoward conduct by Mr. Winston, and,

- Medical evidence establishing that Ms. Kinsman's physical condition was consistent with consensual sex and refuting her assertions that she had been struck on her head or had been drugged.

The web that Ms. Kinsman has spun for herself contradicts her repeated admissions

that she does not know what happened on the evening of December 6, 2012 and the

morning of December 7, 2012.  She follows her admissions of no knowledge of the events

about which she complains with multiple false assertions regarding what allegedly

happened.  To aid in her false allegation of rape (the "False Allegation"), Ms. Kinsman

tampered with witnesses, interfered with criminal investigations, and manufactured new false assertions each time a prior lie was rebutted by the truth.

The record from the six (6) prior proceedings establishes the following:

In the late evening of December 6, 2012, Mr. Winston, Ronald Darby and Christopher Casher arrived at Potbelly's. At some point during that evening, Ms. Kinsman arrived with her friends, Monique Kessler and Ashley.[1] Marcus Jordan, a friend of Ms. Kinsman's, was also present.

Ms. Kinsman, Ms. Kessler, Ashley, and Mr. Jordan shared four to five drinks, which Ms. Kinsman stated she believed resulted in her consumption of approximately 1.5 drinks. At one point in the evening, Ms. Kinsman accompanied Ms. Kessler to the bathroom, where she met and began to talk to Mr. Casher. Ms. Kinsman did not use the bathroom and stayed outside of the bathroom talking to Mr. Casher while Ms. Kessler went into the bathroom. Ms. Kinsman gave Mr. Casher her telephone number.

Ms. Kinsman and Ms. Kessler went to the dance floor. Shortly thereafter, noticing an attractive female (Ms. Kinsman), Mr. Winston also went to the dance floor. Mr. Winston approached Ms. Kinsman and the two engaged in small talk as they began dancing together. Mr. Winston asked Ms. Kinsman for her name and she asked for his. Mr. Winston introduced himself and she introduced herself as "Erica Kinsman." Mr. Winston and Ms. Kinsman danced together for approximately 10 minutes. After Mr. Winston and Ms. Kinsman finished dancing, Mr. Winston asked Ms. Kinsman for her telephone number. It was loud in Potbelly's, so Ms. Kinsman took Mr. Winston's cellular phone and entered her

---

[1] Ms. Kinsman has repeatedly referred to a friend named Ashley without reference to a last name.

telephone number into his phone. Mr. Winston and Ms. Kinsman continued to talk and Mr. Winston mentioned something to Ms. Kinsman regarding staying in touch or getting together later in the evening. Mr. Winston and Ms. Kinsman parted ways, and Mr. Winston went to mingle with his friends. Mr. Casher saw Mr. Winston talking to Ms. Kinsman and told Mr. Winston that he (Mr. Casher) had already obtained Ms. Kinsman's number.

Messrs. Winston, Darby, and Casher left Potbelly's and socialized outside. There were numerous students outside of Potbelly's as well as many taxicabs parked along the curb in front of Potbelly's. At some point later, Mr. Winston sent a text message to Ms. Kinsman telling her that he was outside and asked if Ms. Kinsman wanted to leave. Ms. Kinsman showed Mr. Winston's text message to both Ms. Kessler and Ashley and asked them if she should leave with Mr. Winston. Ms. Kessler responded that if Ms. Kinsman wanted to leave with Mr. Winston, she should do so. Ms. Kessler felt comfortable allowing Ms. Kinsman to make her own decision because Ms. Kinsman did not appear to be intoxicated. In fact, Ms. Kinsman said that she was not intoxicated. Immediately following her conversation with Ms. Kessler, Ms. Kinsman replied to Mr. Winston's text message that she was ready to leave and was coming outside.

Messrs. Winston, Darby, and Casher were standing by a taxicab when Ms. Kinsman voluntarily left Potbelly's and approached them. The four of them entered a taxicab. Prior to entering the taxicab, Ms. Kinsman did not protest or express in any manner that she was being forced, coerced or otherwise compelled to act against her will or that she did not wish to get into the taxicab. The four passengers went to Mr. Winston's and Mr. Casher's apartment located at the Legacy Suites in Tallahassee, Florida.

Ms. Kinsman sat behind the driver. The taxicab ride lasted approximately five minutes. During the ride, Ms. Kinsman did not protest or express in any manner that she was being forced, coerced or otherwise compelled to act against her will. In fact, everyone was cheerful and talking.

In this regard, during the taxicab ride, Messrs. Winston, Darby, and Casher asked Ms. Kinsman if she had any friends who might want to come to the apartment and join them. Ms. Kinsman called and texted Ms. Kessler because Mr. Casher wanted to "hook up" with Ms. Kessler.

Upon arriving at Legacy Suites, all four entered Mr. Winston's and Mr. Casher's apartment. Yet again, while walking from the taxicab to the apartment, Ms. Kinsman did not protest or express in any manner that she was being forced, coerced or otherwise compelled to act against her will.

Ms. Kinsman and Mr. Winston went into Mr. Winston's bedroom and began kissing and touching each other's bodies. Ms. Kinsman willingly performed oral sex on Mr. Winston in his room with the lights on. Mr. Winston's bedroom door would not close entirely because the lock was broken. Mr. Casher and Mr. Darby peeked in the bedroom and witnessed Ms. Kinsman performing oral sex on Mr. Winston. Ms. Kinsman and Mr. Winston engaged in foreplay and petting. During their interaction, Mr. Winston reached into his dresser drawer and obtained a condom. Ms. Kinsman helped Mr. Winston put the condom on and they engaged in consensual sexual intercourse. Ms. Kinsman did not do or say anything to express that she did not want to engage in sex. Indeed, Mr. Winston and Ms. Kinsman changed sexual positions multiple times, including Ms. Kinsman positioning

herself on top of Mr. Winston. Ms. Kinsman audibly and physically expressed her pleasure with the sexual intercourse. At no time did Ms. Kinsman say "no" to Mr. Winston or otherwise protest against having sex with Mr. Winston.

To the contrary, at some point, Mr. Casher entered the bedroom either to participate in the sexual acts or as a prank. Ms. Kinsman told Mr. Casher to get out of the room. Ms. Kinsman did not protest to Mr. Casher that she was being raped. Messrs. Casher and Darby have stated that they had no reason to believe Ms. Kinsman and Mr. Winston were not engaged in consensual sex and that they did not feel they needed to stop the consensual sexual encounter.

Mr. Casher left the room and Ms. Kinsman rose from the bed, followed him and struggled to close the door completely, and turned off the lights in Mr. Winston's room. Mr. Winston told Ms. Kinsman that the door was broken and did not close completely or lock. Ms. Kinsman returned to Mr. Winston and the two continued to engage in consensual sexual intercourse. Thereafter, Mr. Casher or Mr. Darby pushed the door open again as a prank, which prompted Ms. Kinsman to ask Mr. Winston if there was somewhere more private they could go to continue to have consensual sex. Mr. Winston suggested they continue having sex in his bathroom because the bathroom door locked. Mr. Winston and Ms. Kinsman went to the bathroom where they continued and eventually concluded having sex. Ms. Kinsman also did not protest or say "no" to Mr. Winston while they had sex in the bathroom.

After some post-coital conversation, Ms. Kinsman indicated she was ready to leave. Ms. Kinsman and Mr. Winston got dressed. Mr. Winston asked Ms. Kinsman where she

lived. Ms. Kinsman told Mr. Winston that her dormitory was not far from his apartment. Mr. Winston offered to give Ms. Kinsman a ride home. Ms. Kinsman accepted.

Mr. Winston and Ms. Kinsman left Mr. Winston's apartment and got on Mr. Winston's motor scooter. Ms. Kinsman sat behind Mr. Winston on the scooter and wrapped her arms around Mr. Winston's waist. Mr. Winston dropped Ms. Kinsman off at the curb in front of Salley Hall on FSU's campus. Ms. Kinsman got off the scooter, gave Mr. Winston a hug, and walked through the Salley Hall walkway to her dormitory, Kellum Hall.

The following are Ms. Kinsman's lies that have been rejected by the TPD, the State Attorney, the hearing officers in the Code of Conduct hearings for Messrs. Darby and Casher, the Honorable Justice Major B. Harding, the hearing officer in Mr. Winston's Code of Conduct hearing, and Dr. Allison Crume, the appellate officer who presided over Ms. Kinsman's appeal of the favorable decision issued by Justice Harding. These six (6) proceedings provide an indisputable record of the multiple lies that Ms. Kinsman has told to keep an extortion enterprise alive. Ms. Kinsman has made new false assertions to account for prior lies that were exposed by investigations by the TPD, Florida's State Attorney, and by the records in the three (3) prior Code of Conduct hearings. As her civil litigation strategy has evolved, so too have Ms. Kinsman's versions of the events of the night of December 6, 2012 and the morning of December 7, 2012. If nothing else, Ms. Kinsman has been consistent at being inconsistent. Nonetheless, Ms. Kinsman's claim has been based on one primary, immutable, and fatal fact. She admits that she does not know what happened.

Initially, Ms. Kinsman claimed her lack of memory occurred because "some dude hit her on the head." Ms. Kinsman told this lie to Bria Henry and Jenna Weisberg, the first people to whom Ms. Kinsman apparently spoke following her sexual encounter with Mr. Winston. Ms. Kinsman said that she had been hit in the back of the head, blacked out, and woke up with a man on top of her. When the medical evidence made clear that Ms. Kinsman had not been struck in the head, Ms. Kinsman changed her story and claimed that Ms. Henry and Ms. Weisberg had misunderstood her.

After her lie that she had been struck on the head was refuted by medical evidence, Ms. Kinsman just told a new lie and said her memory lapse and inconsistent version of events was the result of having unknowingly consumed some unspecified drug. Ms. Kinsman's counsel proclaimed that the "**only explanation**" for Ms. Kinsman's memory loss was that Ms. Kinsman had been drugged. This statement was conclusively rebutted by scientific evidence.

Dr. Bruce Goldberger of the University of Florida Pathology Laboratories tested Ms. Kinsman's urine for the presence of any substance that could have caused Ms. Kinsman to black out and/or to lose her memory. **All tests were negative for 172 different drugs and their metabolites**. Ms. Kinsman had not been drugged.

Having been exposed by medical and scientific evidence establishing that she was neither struck in the head nor drugged, Ms. Kinsman simply told another new lie. Ms. Kinsman claimed that her memory loss was attributable to "trauma." Ms. Kinsman claimed, without any psychological or psychiatric examinations or any scientific evidence, that not only did trauma cause her to lose her memory, but that her memory improved over time. Ms.

Kinsman has taken her story out on six (6) test drives, adjusting it each time a lie is exposed and debunked. **This case is her seventh excursion.**

The evidence, however, has consistently refuted Ms. Kinsman's lies. For example, during Mr. Winston's Code of Conduct Hearing, a Sexual Assault Nurse Examiner, Kathy Walker, the nurse who examined Ms. Kinsman for an alleged rape, testified that Ms. Kinsman's physical condition was consistent with consensual sex. Ms. Kinsman's shifting story is despicable.

One example of Ms. Kinsman's evolving lie involves a shot of alcohol Ms. Kinsman claims she was given at Potbelly's. Despite the fact that the lie about the shot does nothing to advance her new lie that trauma caused her memory loss, Ms. Kinsman is stuck with it. So, she has tried to make the lie better.

1) First, Ms. Kinsman informed Officer Dinorah Harris of the TPD that while she was walking through the bar an unknown male handed her a shot;

2) Second, in her written statement to law enforcement investigators, Ms. Kinsman said that one of Mr. Jordan's friends gave her a shot;

3) Third, in a TPD interview with Officer Clayton Fallis, Ms. Kinsman said that as she was walking through the club she was given a shot by **an unknown white male,** who she believed was Mr. Jordan's friend. ;

4) Fourth, in an interview with Officer Scott Angulo of the TPD, Ms. Kinsman said a bartender gave her the shot; and, most recently,

5) Fifth, after identifying four men other than Mr. Winston, Ms. Kinsman claimed during Mr. Winston's Code of Conduct Hearing that Mr. Winston gave her the shot.

Mr. Winston is a black man. When confronted with her prior inconsistent statement that a shot was given to her by **an unknown white male**, Ms. Kinsman claimed that Officer Fallis'

report was wrong.  This is the same tactic Ms. Kinsman used to dodge her prior statements to Ms. Henry and Ms. Weisberg regarding being struck on her head.

It is equally fatal to Ms. Kinsman's scheme that she told Officer Angulo that a bartender gave her the shot.  Ms. Kinsman danced with Mr. Winston, left Potbelly's with him, had sex with him, and then rode home with him on his scooter.  She may not have remembered Mr. Winston's name, but **Ms. Kinsman knew Mr. Winston was not the bartender**.

Ms. Kinsman lied about the shot of alcohol at Potbelly's.

Multiple lies are spawned from the ride in the taxicab.

First, in her pre-hearing brief in Mr. Winston's Code of Conduct hearing, Ms. Kinsman claimed for the first time that she was "taken" and "coerced" into the taxicab.  This new "fact" is contradicted by the record, including testimony by Ms. Kinsman's friends. Specifically, Ms. Kessler testified on several occasions that Ms. Kinsman received a text message asking her to come outside of Potbelly's.  Ms. Kinsman asked Ms. Kessler if she should go outside.  Ms. Kessler testified that if Ms. Kinsman wanted to go outside, she should.  In turn, Ms. Kessler testified that Ms. Kinsman immediately left Potbelly's and went outside.

Leaving aside the absurd assertion that she was "coerced" by a text message, if Ms. Kinsman felt threatened or coerced, she could have simply stayed inside of Potbelly's with her friends. Instead, Ms. Kinsman went outside voluntarily to meet Messrs. Winston, Darby and Casher.  Once outside, Ms. Kinsman could have offset any threat by alerting the numerous students who were outside of Potbelly's that she was being threatened or coerced

by Messrs. Winston, Darby and Casher.  Ms. Kinsman also could have alerted any of the numerous taxicab drivers who were outside of Potbelly's that she was being threatened or coerced by Messrs. Winston, Darby and Casher.  Ms. Kinsman was not threatened or coerced.  She did not take the opportunity to remove the alleged threat or the coercion by either staying in the bar or alerting the numerous people outside of the bar that she was in danger because she was not in danger. To the contrary, the facts establish that Ms. Kinsman voluntarily left Potbelly's, voluntarily walked directly to Messrs. Winston, Darby, and Casher outside of Potbelly's, and voluntarily entered a taxicab with them.

Once inside the taxicab, Ms. Kinsman's voluntary conduct continued.  Ms. Kinsman sat directly behind the driver and next to the left, rear passenger door.  She did not inform the driver that she was in danger.  She did not attempt to open the door and exit the cab whenever it stopped.  Ms. Kinsman was neither threatened nor coerced to leave Potbelly's and accompany Mr. Winston and his friends to Mr. Winston's apartment.

Ms. Kinsman admits that she attempted to call Ms. Kessler in the taxicab, but the call did not connect.  Remarkably, though she allegedly was being threatened and coerced, Ms. Kinsman admits that she had access to her phone, but she did not use it to call for aid.  Ms. Kinsman tried to call Ms. Kessler, but she did not call 911 or text anyone to rescue her from the allegedly threatening and coercive predicament.  The truth is that Ms. Kinsman voluntarily sat in the taxicab and engaged in friendly banter as she texted Ms. Kessler in hopes Ms. Kessler would come to Mr. Winston's apartment to "hook up" with Mr. Casher.

Curiously, Ms. Kinsman claimed for the first time in Mr. Winston's Code of Conduct hearing that nobody in the taxicab spoke to her.  Prior to Mr. Winston's hearing, however,

Ms. Kinsman had consistently stated that one of the males in the taxicab asked her to call Ms. Kessler because the male wanted to "hook up" with Ms. Kessler. This new lie was necessary as a runway for another new lie that Ms. Kinsman tried to contact Ms. Kessler to seek help. Ms. Kinsman cannot have it both ways: either she was in danger and was looking to escape or she was delighted and sought to include a friend. No facts support the former; all the facts support the latter.

Ms. Kinsman lied about the taxicab ride.

Following the consensual sexual encounter, Ms. Kinsman willingly sat on Mr. Winston's motor scooter and put her arms around his waist as he drove her home. After being dropped off at the curb outside of Salley Hall, **Ms. Kinsman gave Mr. Winston a hug** and walked through the Salley Hall walkway to her adjacent dormitory, Kellum Hall. Ms. Kinsman claims she walked back to her dormitory crying. Ms. Kinsman apparently did not pass one student or one campus police officer because she did not make an outcry to anyone and nobody came to her aid after Mr. Winston dropped her off and before she got to her dormitory room.

There is no evidence that Ms. Kinsman ever made an outcry. Though she had her phone, Ms. Kinsman did not call 911 to report her alleged rape. Ms. Kinsman did not call a family member, the boyfriend with whom she claims she was in love, or any friends to report that she had been raped. Ms. Kinsman sent numerous texts following the alleged rape, but none of them mentions rape until 11:53 a.m. on the morning of December 7, 2012.

Rather than using all of these possible forms of communication, Ms. Kinsman contends that her initial outcry was made on Twitter, by tweeting "Someone Please Help."

However, despite the numerous twitter records that were produced in the six (6) prior reviews of Ms. Kinsman's claim, this alleged tweet was not produced. To date, there is no evidence of an outcry. There is, however, substantial evidence that thoroughly undermines Ms. Kinsman's false claims.

The record establishes that the alleged assault occurred at or around 1:30 am on December 7, 2012. Shortly thereafter, the first text message sent by Ms. Kinsman begins an exchange between Ms. Kinsman and Ms. Kessler that started at 1:45 a.m. and lasted until 2:37 a.m. Despite the fact the she allegedly had just been violently raped, Ms. Kinsman's first text following her alleged rape made no mention of being raped. Instead, Ms. Kinsman asked Ms. Kessler if she had Ms. Kinsman's school identification card. Ms. Kinsman's subsequent, multiple text communications with Ms. Kessler also make no mention of being raped. *Id.*

Ms. Kinsman also engaged in another confounding text exchange with a friend beginning at 4:41 a.m. on December 7, 2012. Just a few hours after Ms. Kinsman alleges she was raped and while she claims she suffered from memory loss because she was (1) hit on the head, (2) drugged, or (3) suffered such a severe trauma that erased her memory, Ms. Kinsman remembered to text a friend to solicit test answers that would enable her to cheat on an examination that she remembered she had on the following day. This text exchange occurred while Ms. Kinsman was in Tallahassee Memorial Hospital undergoing an examination for an alleged rape. It is impossible to reconcile Ms. Kinsman's alleged amnesia with her conduct. Ms. Kinsman can give no credible explanation that reconciles

her inability to remember her alleged rape with her ability to remember that she had a test the next morning.

Ms. Kinsman is lying about her outcry.

Ms. Kinsman is engaged in a vile scheme that has evolved as follows:

- Following the media circus she created with her press conference, Ms. Kinsman's counsel appeared on national television and threatened to sue Mr. Winston. In response, Wm. David Cornwell, Sr., directed his associate, Benjamin Levine, Esq., to call Ms. Kinsman's counsel and tell her that their firm, Gordon & Rees, was authorized to accept service of a complaint on Mr. Winston's behalf.

- In response, Ms. Kinsman's counsel initiated "settlement" discussions with an unsolicited request that Mr. Winston participate in "pre-suit mediation."

- In a later call Ms. Kinsman's counsel demanded $7,000,000 from Mr. Winston and requested that he obtain an insurance policy "to protect her client's interests in the event he gets injured this year."

- Ms. Kinsman's counsel later sought a response or a counter-offer to her $7,000,000 demand and ended this phone call by stating, "**by the way, if we settle you will never hear from my client or me again, in the press or anywhere**."

Contemporaneous records memorialize communications between counsel. Where she has not lied, Ms. Kinsman has been on a campaign to obstruct the truth.

On January 10, 2013, Ms. Kinsman publicly identified Mr. Winston as the man who allegedly sexually assaulted her. Ms. Kinsman advised a FSU counselor that she and Mr. Winston shared a class. FSU immediately offered Ms. Kinsman the options of dropping the class or transferring to another class, all without academic consequence. Ms. Kinsman declined both options because Mr. Winston sat in the back of the class.

On January 11, 2013, Ms. Kinsman's attorney informed TPD that they were not to communicate with Ms. Kinsman independently, and that all communications must go through counsel. Ms. Kinsman's counsel also directed FSU that they were not to communicate directly with Ms. Kinsman and that all communications must go through counsel.

On February 11, 2013, the TPD suspended their investigation due to "a lack of cooperation" from Ms. Kinsman. Despite the canard perpetuated in the media, TPD also abandoned its investigation because "probable cause could not be established given the conflicting statements between what the victim told her friends and what was reported to the police."

On November 14, 2013, State Attorney Investigator Jason Newlin was asked by the State Attorney Chief Assistant, Georgia Cappleman, to assist with a follow-up investigation into Ms. Kinsman's allegations. Ms. Kinsman's counsel informed Investigator Newlin that any contact with Ms. Kinsman was to go through counsel. Investigator Newlin contacted Ms. Kessler, who told him she would call him back to schedule an interview. A few minutes later, Ms. Kessler contacted Investigator Newlin and advised him that she was too busy to be interviewed at that time. Eventually a meeting was scheduled between Ms. Kessler and Investigator Newlin. Investigator Newlin learned that, prior to meeting with Investigator Newlin, Ms. Kessler had dinner with Ms. Kinsman's counsel to discuss her upcoming interview with Investigator Newlin.

On November 18, 2013, when Investigator Newlin contacted Mr. Jordan to set up an interview, Mr. Jordan advised Investigator Newlin that he needed to speak with Ms. Kinsman's counsel prior to speaking with Investigator Newlin.

Ms. Kinsman's boyfriend at this time was named Jamal Roberts. Ms. Kinsman concealed Mr. Roberts' identity from her father, her own lawyer, her friends, and from law enforcement. Eventually, Ms. Kinsman had to come clean and identify Mr. Roberts. She was compelled to identify Mr. Roberts after he was considered to be the potential source of DNA that was found on the clothing Ms. Kinsman wore on the night of her sexual encounter with Mr. Winston. On the advice of Ms. Kinsman's counsel, Mr. Roberts refused to give a DNA sample to law enforcement without a subpoena.

Ms. Kinsman's counsel told the State Attorney that Ms. Kessler shared clothes with Ms. Kinsman and that Ms. Kessler may have previously worn the pants that Ms. Kinsman wore on the night of the alleged sexual assault. Investigator Newlin noted in his report that it was unlikely that Ms. Kessler wore Ms. Kinsman's pants since Ms. Kinsman is 5'5"and Ms. Kessler is 5'8." When Investigator Newlin asked Ms. Kessler about the contention that Ms. Kinsman and Ms. Kessler shared clothes, Ms. Kessler could not recall ever wearing Ms. Kinsman's clothes.

Forensic examination of the clothes Ms. Kinsman wore on the night of the sexual encounter with Mr. Winston revealed the presence of DNA from two separate men, one of whom was identified as Mr. Winston. On November 21, 2013, Ms. Kinsman informed Investigator Newlin that the unknown DNA on her pants belonged to her boyfriend, Jamal Roberts. Thereafter and despite Ms. Kinsman's prior admission, on November 25, 2013,

Ms. Kinsman's counsel informed the State Attorney that the pants Ms. Kinsman wore on the night of the alleged assault were actually purchased **after** the sexual encounter with Mr. Winston. Ms. Kinsman's counsel also reported that Mr. Roberts was not the source of the then unknown DNA.

Accordingly, Ms. Kinsman directly and indirectly attempted to manipulate evidence and impede TPD and the State Attorney's investigation.

Ms. Kinsman is lying.

## **ANSWER**

Defendant Jameis Winston ("Defendant" or "Winston") answers the Complaint of Plaintiff Erica Kinsman ("Plaintiff") as follows:

### **Overview**

1.     This is an action for (i) sexual battery, (ii) assault, (iii) false imprisonment, and (iv) intentional infliction of emotional distress arising out of forcible rape.

**ANSWER:**    Paragraph 1 states a legal conclusion to which no answer is required. To the extent an answer is required, Defendant denies the allegations contained in Paragraph 1. Specifically, Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.

**Jurisdiction, Parties & Venue**

2.      The Court has subject matter jurisdiction pursuant to FLA. STAT. §§ 26.012(2) and 34.01(c) inasmuch as the matter in controversy - including monetary damages and other relief sought by Plaintiff - exceeds $15,000.00, exclusive of interest, costs and attorneys' fees.

**ANSWER:**   Paragraph 2 states a legal conclusion to which no answer is required. To the extent an answer is required, Defendant denies allegations contained in Paragraph 2.


3.      Plaintiff is an individual who resides in the State of the Florida.

**ANSWER:**   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and therefore denies the same.


4.      Defendant is an individual who committed tortious acts within the State of Florida and, upon information and belief, currently resides in the State of Alabama.

**ANSWER:**   Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other tortious acts or offense against Plaintiff at any time.  As of the date of the filing of this Answer, Defendant states that he resides in and is a citizen of the State of Florida.  As of the date the Complaint was filed in state court, Defendant was a citizen of the State of Alabama.  Defendant denies the remainder of the allegations of Paragraph 4.

5.      The Court has personal jurisdiction over Defendant pursuant to FLA. STAT. § 48.193(1)(a) because Defendant committed tortious acts within the State of Florida.

**ANSWER:**    Paragraph 5 states a legal conclusion to which no answer is required. To the extent an answer is required, Defendant denies the allegations in Paragraph 5.

6.      Venue is proper in Orange County, Florida inasmuch as Defendant is a non-resident of the State of Florida and has substantial contacts with the State of Florida.

**ANSWER:**    Paragraph 6 states a legal conclusion to which no answer is required. To the extent an answer is required, Defendant denies the allegations in Paragraph 6.

7.      All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred, been performed or have otherwise been waived.

**ANSWER:**    Paragraph 7 states a legal conclusion to which no answer is required. To the extent an answer is required, Defendant denies the allegations in Paragraph 7.

## GENERAL ALLEGATIONS

8.      On December 7, 2012, Plaintiff, then a freshman at Florida State University ("FSU"), was raped in a Tallahassee, Florida apartment. At the time, she did not know the identity of her assailant.

**ANSWER:**    Defendant denies the allegations of Paragraph 8.

9.      Immediately after the rape, Plaintiff cried out on social media asking her group of friends to help her. One such friend got word to Plaintiff's parents and another

friend immediately drove to Plaintiff's dorm room and assisted in calling the police. FSU Police responded and Plaintiff described being sexually assaulted by an unknown male at an apartment building. Roughly two hours after the rape, Plaintiff was transported to Tallahassee Memorial Hospital, where she was examined and treated for vaginal trauma and other injuries inflicted during the rape. The investigation was turned over to Detective Scott Angulo of the Tallahassee Police Department ("Tallahassee Police").

**ANSWER:** Defendant denies that any rape or sexual assault occurred and denies that Plaintiff sustained any injuries in connection with any alleged rape or sexual assault by Defendant because none occurred. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 9 and therefore denies the same.

10.    On January 10, 2013, as the spring semester began, Plaintiff recognized her assailant on the first day of a class in which they were both enrolled. Plaintiff listened for his name during roll call and promptly provided it to the Tallahassee Police: Jameis Winston.

**ANSWER:** Defendant denies that any rape or sexual assault occurred and denies that he is Plaintiff's "assailant." Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 10 and therefore denies the same.

11.    Unbeknownst to Plaintiff at the time, Winston was FSU's premier freshman football recruit. Although he was not yet playing football during his "redshirt" freshman

year, Winston was expected by the football program to start as quarterback in the fall of 2013.

**ANSWER:**  Defendant admits that, at the time in question, he was a freshman football player for Florida State University.  Defendant further admits that he played the position of quarterback but did not play during his freshman year.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 11 and therefore denies the same.

12.     On January 22, 2013, the FSU Athletics Department was in contact with the Tallahassee Police and learned that Winston had been identified as the suspect in Plaintiff's violent sexual assault. High-ranking members of the football department met with Winston and his lawyer, whom FSU officials arranged for Winston, to discuss the rape accusations.

**ANSWER:**  Defendant admits that he met with members of the football department, along with his lawyer, to address the accusations against him.  Defendant denies that he committed any rape, sexual assault, or other offense against Plaintiff.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 12 and therefore denies the same.

13.     On October 25, 2013, Plaintiff's victim advocate at FSU informed her that a second woman had come forward and reported being sexually assaulted by Winston.

**ANSWER:**  Defendant denies that he committed any rape, sexual assault, or other offense against Plaintiff or any other woman.   Defendant lacks knowledge or information

sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 13 and therefore denies the same.


14.     In November 2013, the rape investigation of Winston was leaked to the media and widely reported. Winston had by then become a national college football celebrity, and FSU appeared to be on course for a national championship.

**ANSWER:**     Defendant denies that he committed any rape, sexual assault, or other offense against Plaintiff.  Defendant further admits that Plaintiff leaked details involving her allegations against Defendant to the media in order to influence public perception of Defendant.  Defendant further admits that he played college football for Florida State University, and that the football team won the national championship for the 2013 college football season in January 2014. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 14 and therefore denies the same.


15.     Both in January and November 2013, Winston refused Tallahassee Police requests for interviews.

**ANSWER:**     Defendant admits that he refused interviews with the TPD on the advice of counsel.


16.     Shortly after winning the 2014 BCS National Championship game, FSU conducted a cursory investigation of Winston regarding the rape accusation for the first time. Winston again refused to answer any questions.

**ANSWER:** Defendant admits that he met with FSU regarding the False Allegation and refused to answer questions on the advice of counsel because Plaintiff's attorney threatened a civil suit against Defendant telling ABC News on January 8, 2014, "Absolutely you're gonna see a civil suit, I want heads to roll."

17. At a December 2014 university disciplinary hearing, when asked under oath what Plaintiff did and said to express consent to having sex with him, Winston indicated only that Plaintiff "moaned" and refused to answer all other questions.

**ANSWER:** Defendant admits that Plaintiff "moaned" during their sexual intercourse. Defendant further admits that he testified that Plaintiff "moaned" during their sexual intercourse at his December 2014 disciplinary hearing. Defendant further admits that in lieu of answering additional questions, he entered a statement into evidence, under oath and the penalty of perjury. Defendant stated that Plaintiff performed oral sex on Defendant, engaged in multiple sexual positions with Defendant including being on top of him and helped put a condom on Defendant's penis. Defendant denies the remaining allegations of Paragraph 17.

18. In the fall of 2012, Plaintiff was a first semester freshman at FSU's Tallahassee campus. She had dreamed of attending FSU for many years and was excited to see that dream come true. She pledged a sorority which she loved and was very much enjoying being a new student at her chosen school.

**ANSWER:**    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 18 and therefore denies the same.

19.    On the evening of December 6, 2012, Plaintiff went to Potbelly's, a local bar near campus, with two friends. A loud crowd of hundreds of FSU students milled around several dance and drinking areas.

**ANSWER:**    Defendant admits that Plaintiff was at Potbelly's on December 6, 2012. Defendant further admits that there were many people, including other FSU students, at Potbelly's and outside Potbelly's where Plaintiff willingly got into a cab with Defendant, Casher and Darby. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 19 and therefore denies the same.

20.    Unbeknownst to Plaintiff, in the crowd was another FSU freshman named Jameis Winston from Bessemer, Alabama, who had been recently recruited to play football for FSU. As of December 2012, Winston had not yet played college football and was not well known on campus.

**ANSWER:**    Defendant admits that he was at Potbelly's on the evening of December 6, 2012 or early morning of December 7, 2012. Defendant further admits that he is from Bessemer, Alabama and was recruited to play football at Florida State University. Defendant further admits that he was "redshirted" in the fall of 2012. Defendant lacks

knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 20 and therefore denies the same.

21.     Plaintiff and her friends socialized, danced and consumed alcoholic beverages that her friend Marcus purchased. At one point, Plaintiff was approached by a man who identified himself as "Chris." She would later learn that "Chris" was Chris Casher, a friend of Winston and a defensive end for the FSU football team.

**ANSWER:**     Defendant admits that Chris Casher was, at the relevant time, a member of the Florida State University football team and a friend of Defendant.  Defendant further admits that he danced and talked with Plaintiff that evening or the early morning of December 7, 2012.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 21 and therefore denies the same.

22.     As Plaintiff passed one of Potbelly's bar areas, a man she did not know - who she believes to have been Winston - offered Plaintiff a shot of an unknown liquor, which she consumed. Sometime later, Plaintiff found herself on the sidewalk in front of Potbelly's separated from her friends in the presence of three men. At the time, she did not realize that one of the men was the same "Chris" who had approached her, and that another was the man who had given her the shot. Plaintiff texted her friend Monique "[c]ome find me" because she was growing increasingly uncomfortable and afraid.

**ANSWER:**     Defendant denies the allegations in Paragraph 22.

23.     The men hailed a taxicab and Plaintiff was led inside.

**ANSWER:** Defendant admits that he entered a taxicab with Plaintiff and two of his friends on the night of December 6, 2012. Defendant denies that Plaintiff was "led inside" or that she unwillingly entered the taxicab. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 23 and therefore denies the same.

24. The cab driver observed that Plaintiff appeared to be impaired.

**ANSWER:** Defendant denies the allegations of Paragraph 24.

25. Plaintiff had no idea where the cab was going, who the men were, or what they planned to do. The man seated next to her, later identified as Winston, kept touching and fondling her. Plaintiff pushed him away and told him to stop as she became increasingly panicked. She called her friend Monique twice for help but she did not answer.

**ANSWER:** Defendant denies the allegations of Paragraph 25.

26. After the cab stopped, Plaintiff was taken by the arm and led into the Legacy Suites Apartments by the man who had been fondling her - Winston.

**ANSWER:** Defendant denies the allegations of Paragraph 26.

27. Winston took Plaintiff into a first floor apartment and directly into his bedroom. He then stripped Plaintiff of her clothes, pushed her on his bed, and began forcefully raping Plaintiff in her vagina.

**ANSWER:** Defendant denies the allegations of Paragraph 27.

28.     Plaintiff lay frozen with fear. She said "no, no" and "please stop" over and over, and resisted his efforts to roll her over, but Winston continued.

**ANSWER:**     Defendant denies the allegations of Paragraph 28.


29.     The other two men from the cab, who would later be identified as Casher and Darby, initially remained outside Winston's unlocked bedroom watching Winston rape Plaintiff.

**ANSWER:**     Defendant denies the allegations of Paragraph 29.


30.     Casher then stepped into the room and began filming the rape on his cellphone. Casher would later admit that he wanted to "join in," as he and Winston had apparently done to other women before when they would "run them."[2]

**ANSWER:**     Defendant denies that Plaintiff was raped and admits that, unknown to Defendant at the time, Casher filmed part of the consensual sex between Plaintiff and Defendant.  Defendant further admits that Casher entered the bedroom either to participate in the sexual acts or as a prank.  Defendant denies that he engaged in nonconsensual sexual activity in this or any other instance, ever.


31.     Darby also entered the room but told Winston, "Dude, she is telling you to stop." For a brief moment, Plaintiff thought her nightmare might be over. Instead, Winston picked her up in a fireman's carry, walked her into his bathroom, deposited her onto the hard floor and locked the door.

---
[2] "Running them" or "running a train" is grotesque slang for gang rape.

**ANSWER:**    Defendant denies the allegations of Paragraph 31.


32.    Darby then left the apartment. The next day, he posted to his Facebook page, "I feel the worst I almost felt in my life Smh [shaking my head] # stupid."

**ANSWER:**    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 32 and therefore denies the same.


33.    In the bathroom, Winston resumed raping Plaintiff. She resisted, repeatedly telling him "no" and "stop," and tried to fight him off. But Winston grabbed her arms and legs, pinning her hard against the floor, and continued to thrust. To stop her protests and block her view of him, Winston covered Plaintiff's face with a hand and jammed her head to the side as the thrusts continued.

**ANSWER:**    Defendant denies the allegations of Paragraph 33


34.    Plaintiff continued to try to push and kick Winston off but he was much too strong. Eventually the assault ended. Winston picked Plaintiff up from the bathroom floor and carried her back to the bed where she lay in shock, unable to dress herself. Winston put her clothes on and told her to leave but she did not know where she was.

**ANSWER:**    Defendant denies the allegations of Paragraph 34.


35.    Winston, apparently realizing that Plaintiff did not know where she was, took Plaintiff out of his apartment, put her on his scooter and asked Plaintiff where she lived.

Plaintiff gave him a false address. As Winston drove her there, Plaintiff sat behind, forced to hold on and horrified by having to grasp the body of the man who had just raped her. Winston left Plaintiff at an intersection and disappeared around a corner.

**ANSWER:**   Defendant admits that Plaintiff accepted a ride to her dormitory from Defendant on his scooter.  Defendant denies the remaining allegations of Paragraph 35.


36.   Plaintiff stood overcome by trauma and sobbing in the street. She did not know who to call for help but she knew that if she sent a Tweet, multiple close friends would see it and someone would respond. She tweeted, "SOMEONE HELP ME."

**ANSWER:**   Defendant denies that Plaintiff was "overcome by trauma and sobbing in the street."  Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 36 and therefore denies the same.


37.   Plaintiff's high school friend Bria Henry ("Bria") called almost immediately, at 2:48 a.m. on December 7, 2012, while Plaintiff was still alone in the street. Plaintiff was crying uncontrollably and Bria had to repeatedly ask what happened to understand that Plaintiff had been raped. Bria told Plaintiff that she needed to call her parents right away and Plaintiff began walking the short distance to her dorm.

**ANSWER:**   Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against

Plaintiff. Defendant further denies that Plaintiff was "crying uncontrollably" when he dropped her off. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 37 and therefore denies the same.

38. Immediately after speaking with Bria, Plaintiff's friend Jenna Weisberg ("Jenna") called her. Jenna told Plaintiff that she was coming right over to Plaintiff's dorm. She kept talking with Plaintiff the entire way as she drove, giving reassurances block by block that she would soon be there. Upon arrival, Jenna found Plaintiff still crying uncontrollably. Jenna called the police at 3:22 a.m. and reported that her friend had just been raped by an unknown assailant. FSU Police responded six minutes later.

**ANSWER:** Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff. Defendant further denies that Plaintiff was "crying uncontrollably" when he dropped her off. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 38 and therefore denies the same.

39. Before FSU Police Officer Dinorah Harris ("FSU Officer Harris") arrived, Plaintiff got a phone call from her mother. Bria had contacted her former high school cheerleading coach who had called Plaintiff's parents. Plaintiff, still crying, told her mother and father what had happened that night. They told her they were leaving immediately and would be there in four hours or less.

**ANSWER:**   Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant further denies that Plaintiff was "crying" when he dropped her off. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 39 and therefore denies the same.

40.     Meanwhile, FSU Officer Harris arrived and interviewed Plaintiff, who began to provide detailed information about the incident. At the time, however, Plaintiff did not know the identity of her assailant.

**ANSWER:**   Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 40 and therefore denies the same.

41.     FSU Officer Harris transported Plaintiff to Tallahassee Memorial Hospital for a Sexual Assault Nurse Examination ("S.A.N.E."). The criminal case investigation was turned over to the Tallahassee Police, who interviewed Plaintiff twice that day.

**ANSWER:**   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 41 and therefore denies the same.

42.     During his interview with Plaintiff at the hospital roughly two hours after the rape, Tallahassee Police Officer Clayton Fallis noted that "[s]everal bruises began to appear" on Plaintiff.

**ANSWER:**     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 42 and therefore denies the same.

43.     At the hospital, Plaintiff was met by FSU victim advocate Sarah Groff at 4:09 a.m. They were soon joined by rape crisis victim's advocate Angela Chatfield, who noted that, based on her experience and training, Plaintiff appeared to be in a dissociated state and was traumatized.

**ANSWER:**     Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant further denies that Plaintiff was "in a dissociated state and was traumatized" when he dropped her off.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 43 and therefore denies the same.

44.     The hospital findings included bruises on Plaintiff's arms and legs. The pelvic exam confirmed vaginal tenderness and redness. The sexual assault information sheet accompanying Plaintiff's hospital chart stated, "[U]nknown PERP[.] States held down by arms + legs. Now [with] generalized muscle aches and vaginal tenderness. Now [with]

H[eadache] and nausea. . . ." The hospital chart further recorded that Plaintiff was "[s]aying no and resisting. . . . Hi[gh] severity and urgent."

**ANSWER:**    Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant further denies that Plaintiff ever said "no" or resisted participating in voluntary sexual intercourse with Defendant.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 44 and therefore denies the same.

45.    Just over one month after she was raped, at the start of the next semester, on January 10, 2013, Plaintiff appeared for the first day of a course entitled "Race and Ethnicity." Sitting in the front of the room, she turned around to look for a friend and was shocked to see her attacker in the classroom. She listened until his name was called during the roll call and wrote it down.

**ANSWER:**    Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 45 and therefore denies the same.

46.    Shortly after class, Plaintiff called and left a voice message for Detective Angulo at the Tallahassee Police in which she identified her assailant: "His name is Jameis Winston."

**ANSWER:**    Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 46 and therefore denies the same.


47.    Subsequent to this identification, Winston was further identified by DNA as Plaintiff's assailant.

**ANSWER:**    Defendant admits that Plaintiff willingly engaged in oral sex with Defendant and willingly engaged in sexual intercourse in the late evening of December 6, 2012 or early morning of December 7, 2012.   Defendant denies that he committed any rape, sexual battery, assault, false imprisonment, intentional infliction of emotional distress, or other offense against Plaintiff.  Defendant denies that he was Plaintiff's "assailant" in any way.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 47 and therefore denies the same.


## COUNT I - SEXUAL BATTERY

48.    Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 - 47 above.

**ANSWER:**    Defendant incorporates herein by reference his responses to the preceding allegations in Paragraphs 2-47 above.

49.     Without privilege or consent, Defendant intentionally caused offensive and harmful contacts with Plaintiff's person by removing Plaintiff's clothing, holding Plaintiff down, and forcibly raping Plaintiff in the vagina with his penis.

**ANSWER:**     Defendant denies the allegations of Paragraph 49.


50.     Defendant acted with the intent to cause the foregoing offensive and harmful contacts, against Plaintiff's will and despite her protests and physical resistance.

**ANSWER:**     Defendant denies the allegations of Paragraph 50.


51.     As the direct and proximate result of Defendant's offensive and harmful contacts, Plaintiff has suffered injuries, damages, and losses - including, without limitation, past and future physical injury, pain, and suffering; past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**ANSWER:**     Defendant denies the allegations of Paragraph 51.


**WHEREFORE,** Defendant respectively demands judgment in his favor and against Plaintiff on all counts of this Complaint, and such other and further relief as the Court may deem just and proper.

## COUNT II - ASSAULT

52.     Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 - 47 above.

**ANSWER:** Defendant incorporates herein by reference his responses to the preceding allegations in Paragraphs 2-47 above.

53. Before and during the course of forcibly raping Plaintiff, Defendant intentionally threatened immediate harmful contacts with Plaintiff's person by use of his hands, arms and other body parts.

**ANSWER:** Defendant denies the allegations of Paragraph 53.

54. Defendant intentionally caused or acted with a reckless disregard of causing Plaintiff to fear that such threatened contacts put her in imminent peril and that, in light of his size, strength and surroundings, Defendant had the present ability to carry them out.

**ANSWER:** Defendant denies the allegations of Paragraph 54.

55. Plaintiff readily apprehended these threatened contacts, which created a well-founded fear that sexual and other violence to her person was about to take place.

**ANSWER:** Defendant denies the allegations of Paragraph 55.

56. As the direct and proximate result of Defendant's threatened contacts, Plaintiff has suffered injuries, damages, and losses - including, without limitation, past and future physical injury, pain, and suffering; past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**ANSWER:**     Defendant denies the allegations of Paragraph 56.

**WHEREFORE,** Defendant respectively demands judgment in his favor and against Plaintiff on all counts of this Complaint, and such other and further relief as the Court may deem just and proper.

## COUNT III - FALSE IMPRISONMENT

57.     Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 - 47 above.

**ANSWER:**     Defendant incorporates herein by reference his responses to the preceding allegations in Paragraphs 2-47 above.

58.     Without privilege or authority, Defendant intentionally and physically restrained and confined Plaintiff by use of his hands, arms and other body parts for the purpose of and with the knowledge that his actions would result in Plaintiff being confined and restrained in, among other places, his bedroom and bathroom.

**ANSWER:**     Defendant denies the allegations of Paragraph 58.

59.     Defendant acted with the intent to restrain and deprive Plaintiff of her liberty, against Plaintiff's will and despite her protests and physical resistance.

**ANSWER:**     Defendant denies the allegations of Paragraph 59.

60.     Throughout Defendant's restraint and confinement of her person, Plaintiff had no reasonable means or avenue of escape.

**ANSWER:**    Defendant denies the allegations of Paragraph 60.


61.     Plaintiff in no way consented to being so restrained or confined by Defendant.

**ANSWER:**    Defendant denies the allegations of Paragraph 61.


62.     Defendant's acts of restraining and confining Plaintiff were wholly without authority and completely unreasonable in light of the foregoing facts and circumstances.

**ANSWER:**    Defendant denies the allegations of Paragraph 62.


63.     As the direct and proximate result of Defendant's unlawful restraint and deprivation of her liberty, Plaintiff has suffered injuries, damages, and losses - including, without limitation, past and future physical injury, pain, and suffering; past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**ANSWER:**    Defendant denies the allegations of Paragraph 63.


**WHEREFORE,** Defendants respectively demands judgment in his favor and against Plaintiff on all counts of this Complaint, and such other and further relief as the Court may deem just and proper.

## COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

64.     Plaintiff re-alleges and incorporates herein by reference the preceding allegations in Paragraphs 2 - 47 above.

**ANSWER:**     Defendant incorporates herein by reference his responses to the preceding allegations in Paragraphs 2-47 above.

65.     In forcibly raping Plaintiff, Defendant intentionally caused or acted with a reckless disregard of causing Plaintiff to suffer severe mental anguish and suffering.

**ANSWER:**     Defendant denies the allegations of Paragraph 65.

66.     Defendant's conduct and actions in forcibly raping Plaintiff went beyond all possible bounds of decency and was shocking, atrocious and utterly intolerable in a civilized society.

**ANSWER:**     Defendant denies the allegations of Paragraph 66.

67.     Defendant's aforementioned conduct was extreme and outrageous and caused Plaintiff to suffer severe mental anguish and suffering, including, more specifically, loss of sleep, flashbacks, severe anxiety, fear of repeat sexual violence, an unfounded sense of shame and depression, all of which will continue to require psychological and other counseling.

**ANSWER:**     Defendant denies the allegations of Paragraph 67.

68.     As the direct and proximate result of Defendant's intentional or reckless inflication of emotional distress, Plaintiff has suffered injuries, damages, and losses - including, without limitation, past and future emotional and mental distress, pain, and suffering; past and future harm to Plaintiff's education and its opportunities and benefits; impaired earnings capacity, past and future; and past and future losses of the enjoyment of life.

**ANSWER:**     Defendant denies the allegations of Paragraph 68.

**WHEREFORE,** Defendants respectively demands judgment in his favor and against Plaintiff on all counts of this Complaint, and such other and further relief as the Court may deem just and proper.

## FIRST AFFIRMATIVE DEFENSE

1.     Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

2.     Plaintiff consented to and was a willing participant in the acts alleged and her claims are barred by consent.

## THIRD AFFIRMATIVE DEFENSE

3.     Plaintiff's claims are barred by the doctrine of res judicata.

## FOURTH AFFIRMATIVE DEFENSE

4.     Plaintiff's claims are barred by the doctrine of collateral estoppel.

### FIFTH AFFIRMATIVE DEFENSE

5.     Plaintiff's claims are barred by the doctrines of waiver, laches, and unclean hands.

### SIXTH AFFIRMATIVE DEFENSE

6.     Plaintiff's claims are barred by Plaintiff's own conduct.

### SEVENTH AFFIRMATIVE DEFENSE

7.     Plaintiff's claims are barred by her failure to exhaust her administrative remedies.

### EIGHTH AFFIRMATIVE DEFENSE

8.     Defendant reserves unto himself all of those defenses set forth in Rule 8(c) of the Federal Rules of Civil Procedures and such other defenses, affirmative or otherwise, as may prove through discovery to be applicable.

### NINTH AFFIRMATIVE DEFENSE

9.     Defendant reserves the right to assert such claims, counterclaims, third-party claims, or other claims as investigation and discovery may prove applicable, and hereby reserves unto himself all of his rights associated with any such claim or potential claim.

### PUNITIVE DAMAGES

Defendant reserves the right to oppose any future claim by Plaintiff of her entitlement to punitive damages.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury as to all matters so triable.

## COUNTERCLAIMS

Counter-claimant Jameis Winston ("Winston"), by and for his counterclaims against Plaintiff and Counter-defendant Erica Kinsman ("Kinsman") states as follows:

### BACKGROUND

1.      These counterclaims arise out of the repeated, willful, malicious, and false accusations made by Ms. Kinsman that she was raped by Mr. Winston on the late evening of December 6, 2012 or early morning of December 7, 2012.  Ms. Kinsman and Mr. Winston engaged in consensual sexual relations.  Mr. Winston did not rape Mr. Kinsman.  He did not sexually assault Ms. Kinsman.  He did not commit any criminal or other offense against Ms. Kinsman.

2.      Ms. Kinsman's false claims have been assessed six times by six different reviewers, and all six times those reviewers have determined that Ms. Kinsman's claims lacked merit.

3.      First, the Tallahassee Police Department found no evidence to meet the probable cause standard required to charge Mr. Winston with rape, sexual assault, or any crime.

4.      Second, the Florida State Attorney's office found no evidence to meet the probable cause standard required to charge Mr. Winston with rape, sexual assault, or any crime.

5.      Third, at the FSU Code of Conduct hearing for Chris Casher, who witnessed the consensual sexual encounter, the panel assigned by Florida State University to hear the complaint against Mr. Casher found that Mr. Casher was "not responsible" for engaging in

"conduct of a sexual nature that creates an intimidating, hostile, or offensive environment for another person."

6.    Fourth, at the Code of Conduct hearing for Ronald Darby, who witnessed the consensual sexual encounter, the panel assigned by Florida State University to hear the complaint against Mr. Darby found that Mr. Darby was "not responsible" for engaging in "conduct of a sexual nature that creates an intimidating, hostile, or offensive environment for another person."

7.    Fifth, at Mr. Winston's Florida State University Code of Conduct hearing conducted in December 2014, retired Florida Supreme Court the Honorable Justice Major B. Harding was selected by Mr. Winston and Ms. Kinsman to take sworn testimony, review documentary and other evidence, review all of the facts submitted in the hearing record, and render a decision thereon. After careful and thorough consideration Justice Harding found that the preponderance of the evidence did not support a finding that Mr. Winston committed any violation of FSU's Code of Conduct including that he did not engage "conduct of a sexual nature that creates an intimidating, hostile, or offensive environment for another person"; i.e., Justice Harding found that Mr. Winston did not rape Ms. Kinsman.

8.    Sixth, Ms. Kinsman appealed Justice Harding's ruling and, on March 13, 2015, Florida State University Associate Vice President Allison Crume affirmed Justice Harding's decision. Her decision constituted a final agency action.

9.    Mr. Winston brings this action against Ms. Kinsman out of necessity, not malice or ill will. Nonetheless, Ms. Kinsman's false statements have irreparably harmed him in his professional and personal life. Ms. Kinsman has threatened to make the false

allegation of rape unless Mr. Winston silences her with a substantial monetary payment. Ms. Kinsman has demanded Seven Million Dollars ($7,000,000) from Mr. Winston and promised that, if paid he would never hear from Ms. Kinsman again ("you will never hear from my client or me again, in the press or anywhere").

10.     Ms. Kinsman's claims and accusations against Mr. Winston are false, defamatory, defamatory *per se*, and have maliciously and impermissibly interfered with Mr. Winston's business and personal relationships.

## PARTIES

11.     Mr. Winston is a resident and citizen of the State of Florida. At the time of the alleged incidents giving rise to Ms. Kinsman's Complaint in this action, and at the time Ms. Kinsman's Complaint was filed, Mr. Winston was a citizen of the State of Alabama.

12.     Upon information and belief, Ms. Kinsman is, and at all relevant times was, a resident and citizen of the State of Florida.

## JURISDICTION AND VENUE

13.     This Court has supplemental jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367 because this Court has original jurisdiction over Kinsman's claims in this action, and the counterclaims asserted herein are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has ancillary jurisdiction over these counterclaims pursuant to Fed. R. Civ. P. 13.

14.     Mr. Winston brings these counterclaims in this venue because Ms. Kinsman filed her lawsuit against him in Orange County, and this District and this Division took venue

over her lawsuit after removal, under 28 U.S.C. § 1441(a).  Mr. Winston submits that this is venue is both inappropriate and inconvenient for this dispute.  Accordingly, and contemporaneously with these counterclaims, Mr. Winston is filing a Motion to Transfer Venue to the Northern District of Florida pursuant to 28 U.S.C. § 1404(a).

## FACTS APPLICABLE TO ALL COUNTS

### *Mr. Winston Did Not Rape Ms. Kinsman*

15.     In the late evening of December 6, 2012, Messrs. Winston, Darby, and Casher arrived at Potbelly's bar.

16.     At some point during that evening, Ms. Kinsman arrived with her friends, Ms. Kessler and Ashley.  Mr. Jordan, a friend of Ms. Kinsman, was also present.

17.     Ms. Kinsman, Ms. Kessler, Ashley and Mr. Jordan shared four to five drinks, which Ms. Kinsman stated she believed resulted in her consumption of approximately 1.5 drinks.

18.     At one point in the evening, Ms. Kinsman accompanied Ms. Kessler to the bathroom, where she met and began to talk to Mr. Casher.  Ms. Kinsman gave Mr. Casher her telephone number.

19.     Thereafter, Ms. Kinsman and Ms. Kessler went to the dance floor.  Noticing an attractive female (Ms. Kinsman), Mr. Winston went to the dance floor and approached Ms. Kinsman.  The two engaged in small talk as they began dancing together.  Mr. Winston asked for her name and she asked for his.  Mr. Winston introduced himself and the female introduced herself as "Erica Kinsman."

20.     Mr. Winston and Ms. Kinsman danced together for approximately 10 minutes.

21.     After Mr. Winston and Ms. Kinsman finished dancing, Mr. Winston asked Ms. Kinsman for her telephone number.  It was loud in Potbelly's, so Ms. Kinsman took Mr. Winston's cellular phone and entered her telephone number into his phone.  Mr. Winston and Ms. Kinsman continued to talk and Mr. Winston mentioned something to Ms. Kinsman regarding staying in touch or getting together later in the evening.  Mr. Winston and Ms. Kinsman parted ways, and Mr. Winston went to mingle with his friends.  Mr. Casher saw Mr. Winston talking to Ms. Kinsman and told Mr. Winston that Ms. Kinsman had already given Mr. Casher her telephone number.

22.     Messrs. Winston, Darby, and Casher left Potbelly's and socialized outside. There were numerous students outside of Potbelly's as well as many taxicabs parked along the curb in front.  Mr. Winston text messaged Ms. Kinsman that he was outside and wanted to know if Ms. Kinsman was ready to leave.  Ms. Kinsman showed Mr. Winston's text message to both Ms. Kessler and Ashley and asked them if she should leave with Mr. Winston.  Ms. Kessler responded that if Ms. Kinsman wanted to leave with Mr. Winston, she should do so.

23.     Ms. Kessler felt comfortable allowing Ms. Kinsman to make her own decision because Ms. Kinsman did not appear intoxicated.  In fact, Ms. Kinsman said that she was not intoxicated.  Immediately following her conversation with Ms. Kessler, Ms. Kinsman replied to Mr. Winston's text message that she was ready to leave and was coming outside.

24.     Messrs. Winston, Darby and Casher were standing by a taxicab when Ms. Kinsman voluntarily left Potbelly's and approached them.  The four of them entered the taxicab.  Prior to entering the taxicab, Ms. Kinsman did not protest or express in any manner

that she was being forced, coerced or otherwise compelled to act against her will or otherwise did not wish to enter the taxicab.

25.     The taxicab drove the four passengers to Mr. Winston's and Mr. Casher's apartment located at Legacy Suites in Tallahassee adjacent to FSU's campus.  Ms. Kinsman sat behind the driver.  The ride lasted approximately five minutes.  During the ride, Ms. Kinsman did not protest or express in any manner that she was being forced, coerced or otherwise compelled to act against her will.  In fact, everyone was cheerful and talking.

26.     During the ride, Messrs. Winston, Darby and Casher asked Ms. Kinsman if she had any friends that might want to come to Mr. Winston's and Mr. Casher's apartment and join them.  In response, Ms. Kinsman called and texted at least one of her friends, Ms. Kessler.  Specifically, Ms. Kinsman called and texted Ms. Kessler because Mr. Casher wanted to "hook up" with Ms. Kessler.

27.     Upon arriving at Legacy Suites, all four entered Mr. Winston's and Mr. Casher's apartment.  Yet again, while walking from the taxicab to the apartment, Ms. Kinsman did not protest or express in any manner that she was being forced, coerced, or otherwise compelled to act against her will.

28.     Upon entering Mr. Winston's apartment, Ms. Kinsman and Mr. Winston went into Mr. Winston's bedroom and began kissing and touching each other's bodies.  Ms. Kinsman willingly performed oral sex on Mr. Winston in his room with the lights on.  Mr. Winston's bedroom door would not close entirely because the lock had broken.  Mr. Casher and Mr. Darby peeked in the bedroom and witnessed Ms. Kinsman performing oral sex on Mr. Winston.

29.     Mr. Kinsman and Mr. Winston also engaged in foreplay and petting.  During their interaction, Mr. Winston reached into his dresser drawer and obtained a condom.  Ms. Kinsman helped Mr. Winston put the condom on and they engaged in sexual intercourse.

30.     Ms. Kinsman did not do or say anything to express that she did not want to engage in sex.  Indeed, Mr. Winston and Ms. Kinsman changed sexual positions multiple times, including Ms. Kinsman being on top of Mr. Winston.  Ms. Kinsman was moaning and verbally expressing her pleasure with the sexual intercourse.  At no time did Ms. Kinsman protest or say "no" to Mr. Winston.

31.     At some point, Mr. Casher entered the bedroom either to participate in the sexual acts or as a prank.  Ms. Kinsman told Mr. Casher to get out of the room.  Ms. Kinsman did not protest to Mr. Casher that she was being raped.

32.     Mr. Casher left the room and Ms. Kinsman rose from the bed to close the door completely and shut off the lights.  Mr. Winston told Ms. Kinsman that the door was broken and did not close completely or lock.  Ms. Kinsman returned to Mr. Winston and the two continued to engage in consensual sexual intercourse.

33.     Thereafter, Mr. Casher or Mr. Darby pushed the door open again as a prank, which prompted Ms. Kinsman to ask Mr. Winston if there was somewhere more private they could go.  Mr. Winston suggested they continue in his bathroom because the bathroom door would lock.

34.     Both Mr. Casher and Mr. Darby have stated that they had no reason to believe Ms. Kinsman and Mr. Winston were not engaged in consensual sex and that they did not feel he needed to stop the consensual encounter.

35.     Mr. Winston and Ms. Kinsman went to the bathroom where they continued and eventually concluded having sex.  Ms. Kinsman did not protest or say "no" to Mr. Winston in the bathroom.

36.     After some post-coital conversation, Ms. Kinsman indicated that she was ready to leave.  Ms. Kinsman and Mr. Winston got dressed.  Mr. Winston asked Ms. Kinsman where she lived and Ms. Kinsman told Mr. Winston her dormitory was not far from his apartment.  Mr. Winston offered to give Ms. Kinsman a ride home and Ms. Kinsman accepted.

37.     Mr. Winston and Ms. Kinsman left Mr. Winston's apartment and got on Mr. Winston's motor scooter.  Ms. Kinsman sat behind Mr. Winston on the scooter and wrapped her arms around Mr. Winston's waist.  Mr. Winston dropped Ms. Kinsman off at the curb in front of Salley Hall, a building adjacent to her dormitory.  Ms. Kinsman got off the scooter, gave Mr. Winston a hug, and walked through the Salley Hall walkway to her adjacent dorm, Kellum Hall.

38.     Mr. Winston did not rape Ms. Kinsman.  Mr. Winston did not sexually assault Ms. Kinsman.  Mr. Winston did not assault or otherwise injure Ms. Kinsman.  Mr. Winston did not hold Ms. Kinsman against her will.  Mr. Winston did not commit any crime or offense against Ms. Kinsman.

39.     Ms. Kinsman and her counsel have consistently lied to Florida State University officials and employees, the Tallahassee Police Department, investigators from Florida's Sate Attorney's office, the media, and the general public, not only in alleging that Mr. Winston raped her, but about countless facts and circumstances of the night in question,

all in an effort to manufacture a claim of rape to enable them to coerce and extort a substantial payment from Mr. Winston. Indeed, Ms. Kinsman's counsel, demanded payment of Seven Million Dollars ($7,000,000) from Mr. Winston and promised that if he paid off Ms. Kinsman, "you will never hear from my client or me again, in the press or anywhere."

40. The vicious lies told by Ms. Kinsman include, but are not limited to:

  a. Ms. Kinsman's alleged memory loss—which she has at various points attributed to having been hit on the head, having unknowingly consumed some unspecified drug, or having experienced unidentified "trauma"—which has been debunked by drug tests and other medical evidence;

  b. Ms. Kinsman's assertion that the medical evidence supports a finding of rape, when the Sexual Assault Medical Examiner testified that, based on upon her physical examination of Mr. Kinsman, the condition of Ms. Kinsman's body was consistent with consensual sex;

  c. Ms. Kinsman's claim that she was given a shot of alcohol at Potbelly's at various times by an unknown male, one of Mr. Jordan's friends, an unknown white male, a bartender, and, finally, by Mr. Winston; and

  d. Ms. Kinsman's claim, nearly 20 months after the consensual sexual encounter, that she felt threatened or coerced before, during, and after the taxicab ride to Ms. Winston's apartment, none of which are supported by any other facts and circumstances, including that if she had felt threatened, coerced, or unwilling to get into the taxicab,

multiple people outside of Potbelly's, the taxicab driver, and the other occupants of the taxicab would have witnessed her distress and would have been able to render aid if she requested it.

41.     Additionally, other facts and circumstances demonstrate that Ms. Kinsman was not in distress, not assaulted, and not raped.  For example, Ms. Kinsman appears to have deleted from her phone some of the text messages she sent and/or received on December 6, 2012 and December 7, 2012, but the text messages that remain indicate that she was not in distress immediately following her sexual encounter with Mr. Winston, but instead was texting with friends regarding, among other things, an upcoming test.

### *Ms. Kinsman's False and Defamatory Statements*

42.     Ms. Kinsman has, on multiple occasions, made false statements that Mr. Kinsman raped her and committed other serious crimes against her.

43.     On December 7, 2012 and on multiple occasions thereafter, Ms. Kinsman told her friends and family that Mr. Winston raped her. .

44.     The following are some of the numerous false statements Ms. Kinsman has made.  The statements identified herein shall be referred to as the "False Statements:"

      a.  On or about January 10, 2013 Ms. Kinsman falsely told Tallahassee Police Department Investigator Scott Angulo that Mr. Winston raped her.

      b.  In or around January 2013, Ms. Kinsman falsely told a Florida State University counselor that Mr. Winston had raped her.

c. On November 21, 2013, Ms. Kinsman falsely told State Attorney Investigator Jason Newlin that Mr. Winston had raped her.

d. On December 13, 2013, Ms. Kinsman falsely claimed, through her counsel, that Mr. Winston raped her. Ms. Kinsman made these statements through her counsel on December 13, 2013, more than one year after the alleged assault and **<u>one day</u>** before the 2013 presentation of the Heisman Trophy in New York City to Mr. Winston.

e. On May 19, 2014, Ms. Kinsman, in connection with initiating an FSU Code of Conduct complaint against Christopher Casher and Ronald Darby, falsely stated that Mr. Winston had raped her.

f. On May 20, 2014, Ms. Kinsman falsely told a Florida State University Code of Conduct Board during Messrs. Casher's and Darby's Code of Conduct Hearing at Florida State University that Mr. Winston had raped her.

g. On August 6, 2014, Ms. Kinsman falsely told Sarah Mirkin of Florida State University that Mr. Winston had raped her.

h. On December 2, 2014 and December 3, 2014, Ms. Kinsman lied under oath during Mr. Winston's Code of Conduct Hearing at Florida State University and testified that Mr. Winston had raped her.

i. In or about March 2015, Ms. Kinsman appeared in a documentary entitled "The Hunting Ground." In that documentary, Ms. Kinsman

repeated her malicious, defamatory, and false statements that Mr. Winston raped her.

j. At various times, including on or shortly before December 31, 2014, Ms. Kinsman, acting through her attorneys and other advisors, leaked information (including briefs and transcripts from Mr. Winston's confidential Florida State University Code of Conduct hearing) to various media outlets, including without limitation Vice Sports, who published an article on its website on December 31, 2014.

45. Ms. Kinsman has made the False Statements in an effort to cause damage to Mr. Winston's reputation and to coerce and extort him to give her money and "make her go away." Ms. Kinsman was aware that Mr. Winston was likely to earn a substantial amount of money in salary, bonuses, and endorsements as a professional NFL football player. Ms. Kinsman, in concert with her attorneys, was and is motivated to make her malicious and false public statements that she was raped by Mr. Winston in order to influence public perception of Mr. Winston, impair his marketability, and ultimately coerce him into paying her off to "make her go away."

***Ms. Kinsman Knew of and Specifically Targeted Mr. Winston's Earnings Potential***

46. Mr. Winston was, at relevant times, a blue-chip, Heisman Trophy-winning, National Champion college football quarterback expected to be selected by an NFL team with a high first-round draft pick in the 2015 NFL Draft.

47. Indeed, on April 30, 2015, Mr. Winston was selected by the Tampa Bay Buccaneers with the first overall pick in the NFL Draft.

48.     Mr. Winston has (and at all relevant times had) the potential to earn a substantial amount of money in salary, bonuses, and endorsements as a professional NFL football player, along the lines of quarterbacks drafted in the recent past under similar circumstances, including without limitation Robert Griffin III, Andrew Luck, Cam Newton, Sam Bradford, and Matthew Stafford.

49.     At the various times Ms. Kinsman made the False Statements, Mr. Winston had a prospective business relationship with the various NFL teams that were considering drafting him, as well as a prospective business relationship with corporations and other organizations willing to enter into commercial agreements with him to use his name, likeness and other attributes to endorse their products and services.

50.     At all relevant times, Ms. Kinsman had actual knowledge of Mr. Winston's status as a star college football player and NFL prospect.  She knew that Mr. Winston stood to make a substantial amount of money as an NFL player following his departure from Florida State University and selection in the 2015 NFL Draft.

51.     Indeed, Ms. Kinsman demanded that Mr. Winston pay Seven Million Dollars ($7,000,000) and promised that Mr. Winston would not hear from Ms. Kinsman again ("if we settle you will never hear from my client or me again, in the press or anywhere").  Ms. Kinsman's counsel requested that Mr. Winston take out an insurance policy in the event he was injured and unable to earn the amounts he was expected to earn as an NFL player.

## COUNT ONE

### DEFAMATION *PER SE*

52.     Mr. Winston hereby re-alleges and restates the allegations contained in Paragraphs 1 through 51 and incorporates them as they were fully restated herein.

53.     Ms. Kinsman made the False Statements.

54.     Ms. Kinsman made the False Statements with knowledge of or reckless disregard as to the falsity of those statements because she knows that no rape occurred. Other, corroborating evidence confirmed that Ms. Kinsman and her counsel have consistently lied to Florida State University officials and employees, the Tallahassee Police Department, the media, and the general public, not only in alleging that Mr. Winston raped her, but about countless facts and circumstances of the night in question as set forth above.

55.     Ms. Kinsman made the False Statements individually and/or by causing them to be made through her attorneys, advisors, and/or agents.

56.     Ms. Kinsman published the False Statements and/or caused them to be published—individually and/or through her attorneys, advisors, and/or agents—as set forth above.

57.     Ms. Kinsman's publication of the False Statements tarnished Mr. Winston's reputation and public image, and caused him to incur actual damages.  Such damages include, but are not limited to: (a) loss of lucrative endorsement deals that Mr. Winston otherwise would have received had Ms. Kinsman not made the False Statements that tarnished Mr. Winston's reputation and public image; (b) lesser value of endorsement deals that Mr. Winston did receive, but that would have been more valuable had Ms. Kinsman not

made the False Statements that tarnished Mr. Winston's reputation and public image. All of these damages have been caused and initiated by Ms. Kinsman's False Statements.

58.     Ms. Kinsman's False Statements constitute *per se* defamation. She has explicitly and falsely stated that Mr. Winston committed the infamous and heinous crime of rape against her. Ms. Kinsman's False Statements subjected Mr. Winston to hatred, distrust, ridicule, contempt, and/or disgrace, which is evident from the media coverage of and public reaction to Ms. Kinsman's False Statements. And they have irreparably injured Mr. Winston in his business or profession in the ways discussed above, such as through lost or reduced endorsement opportunities, and will continue to injure him in the future.

59.     Ms. Kinsman's primary purpose in making the False Statements was to indulge ill will, hostility, and an intent to harm Mr. Winston, in order to entice, coerce, extort, and force him to pay her a substantial amount of money to "make her go away."

60.     Mr. Winston did not rape, sexually assault, or commit any criminal or other offense against Ms. Kinsman. Her False Statements are *per se* defamatory because she has repeatedly accused him of committing a crime that he did not commit.

61.     Mr. Winston has suffered actual damages as the result of Ms. Kinsman's False Statements, in an amount greater than $75,000.

62.     Mr. Winston is also entitled to punitive damages in an amount to be determined.

**WHEREFORE**, Counterclaim Plaintiff Jameis Winston respectfully demands judgment against Counterclaim Defendant Erica Kinsman for actual damages, punitive

damages, attorneys' fees, costs, interest, and other just and further relief as this Court deems just and equitable.

## COUNT TWO

### DEFAMATION

63.     Mr. Winston hereby re-alleges and restates the allegations contained in Paragraphs 1 through 62 and incorporates them as they were fully restated herein.

64.     Pleading in the alternative to Count I, Mr. Winston re-alleges each of the allegations contained therein as defamation *per se*, and here alleges that each of the False Statements also constitutes general defamation under Florida law.  Mr. Winston thus claims here that if the Court finds that any of the False Statements identified above under Count I do not constitute defamation *per se*, then in the alternative Mr. Winston claims here that any and all such False Statements not qualifying as defamation *per se* constitute general defamation against Mr. Winston.

65.     Ms. Kinsman has made false accusations that Mr. Winston raped her on multiple occasions in multiple settings.

66.     Ms. Kinsman made the False Statements with knowledge of or reckless disregard as to the falsity of those statements because she knows that no rape occurred. Other, corroborating evidence confirmed that Ms. Kinsman and her counsel have consistently lied to Florida State University officials and employees, the Tallahassee Police Department, the media, and the general public, not only in alleging that Mr. Winston raped her, but about countless facts and circumstances of the night in question.

67.     Ms. Kinsman published the False Statements and/or caused them to be published— individually and/or through her attorneys, advisors, and/or agents—as set forth above.

68.     Ms. Kinsman's publication of the False Statements tarnished Mr. Winston's reputation and public image, and caused him actual damages.  Such damages include, but are not limited to: (a) loss of lucrative endorsement deals that Mr. Winston otherwise would have received had Ms. Kinsman not made the False Statements that tarnished Mr. Winston's reputation and public image; (b) lesser value of endorsement deals that Mr. Winston did receive, but that would have been more valuable had Ms. Kinsman not made the False Statements that tarnished Mr. Winston's reputation and public image.  All of these damages have been caused and initiated by Ms. Kinsman's False Statements.

69.     Ms. Kinsman's primary purpose in making the False Statements was to indulge ill will, hostility, and an intent to harm Mr. Winston, in order to entice, coerce, extort, or force him to pay her a substantial amount of money to "make her go away."

70.     Mr. Winston has suffered actual damages as the result of Ms. Kinsman's False Statements in an amount greater than $75,000.

71.     Mr. Winston is also entitled to costs and attorneys' fees in an amount to be determined.

72.     Mr. Winston is also entitled to punitive damages in an amount to be determined.

**WHEREFORE**, Counterclaim Plaintiff Jameis Winston respectfully demands judgment against Counterclaim Defendant Erica Kinsman for actual damages, punitive

damages, attorneys' fees, costs, interest, and other just and further relief as this Court deems

just and equitable.

## COUNT THREE

**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**

73.     Mr. Winston hereby re-alleges and restates the allegations contained in

Paragraphs 1 through 72 and incorporates them as they were fully restated herein.

74.     Mr. Winston has (and at all relevant times had) a prospective business

relationship with the NFL teams that were considering drafting Mr. Winston.

75.     Mr. Winston has (and at all relevant times had) a prospective business

relationship with corporations and other organizations who were willing to enter into

commercial agreements with Mr. Winston to use his name, likeness and other attributes to

endorse their products and services, in keeping with the precedent of quarterbacks drafted in

the recent past under similar circumstances, including without limitation Robert Griffin III,

Andrew Luck, Cam Newton, Sam Bradford, and Matthew Stafford.

76.     At all relevant times, Ms. Kinsman (a self-professed Florida State University

football fan) had actual knowledge of Mr. Winston's status as a star college football player

and NFL prospect.  She had actual knowledge that Mr. Winston stood to make a substantial

amount of money as an NFL player, both in salary and bonuses from the team that drafted

him, and in endorsements.

77.     Upon information and belief, Ms. Kinsman has repeated her False Statements

with the specific intent of causing immediate injury to Mr. Winston thereby enhancing her

ability to coerce Mr. Winston into paying her off to silence her and, thereby, preserve his

prospective business relationships and his future earnings. Indeed, upon information and belief, shortly before filing the instant action, one of Ms. Kinsman's counsel asked members of the media and, perhaps, other informed persons how far in the 2015 NFL Draft Mr. Winston would fall if he were not selected with the first pick of the NFL Draft. Thereafter, on April 16, 2015, two weeks before the 2015 NFL Draft, Ms. Kinsman filed the instant action.

78.    Upon information and belief, the inquiry in the preceding paragraph and the date on which the instant action was filed reveals Ms. Kinsman's specific intent to cause injury to Mr. Winston by repeating the False Statements in various forms (including in the instant action) to create an incentive for Mr. Winston to succumb to Ms. Kinsman's demand for payment.

79.    Ms. Kinsman's False Statements were intentional, willful, and unjustifiable. By making the False Statements, Ms. Kinsman intentionally and unjustifiably interfered with the relationships between Mr. Winston and the NFL teams considering drafting him, and Mr. Winston and the corporations and organizations considering entering into endorsement deals with him. The False Statements are unjustifiable in that they are wholly false, and Ms. Kinsman had no legitimate reason to make them.

80.    Ms. Kinsman's False Statements have caused significant reputational and professional injury to Mr. Winston, as evidenced by the almost inconceivable amount of media attention devoted to Ms. Kinsman's False Statements.

81.    Ms. Kinsman's False Statements, made directly and indirectly through and at the direction of her counsel, were calculated to cause enough damage to Mr. Winston in his

lawful business in order to coerce and extort him to make a civil settlement with her and "make her go away." Ms. Kinsman knew that her allegations would substantially harm Mr. Winston and his professional prospects, but that he likely would still sign some form of NFL contract and earn sufficient salary and other income to "pay her off." This was Ms. Kinsman's intent; she had no alternative, legitimate reason for her conduct.

82.     Mr. Winston has suffered actual damages as the result of Ms. Kinsman's tortious interference with his prospective business relations in an amount greater than $75,000.

83.     Mr. Winston is also entitled to costs and attorneys' fees in an amount to be determined.

84.     Mr. Winston is also entitled to punitive damages in an amount to be determined.

**WHEREFORE**, Counterclaim Plaintiff Jameis Winston respectfully demands judgment against Counterclaim Defendant Erica Kinsman for actual damages, punitive damages, attorneys' fees, costs, interest, and other just and further relief as this Court deems just and equitable.

## JURY DEMAND

Counterclaim Plaintiff Jameis Winston respectfully demands a trial by jury on all matters so triable.

Respectfully submitted this 8th day of May, 2015.

> */s/John F. Meyers*
> John F. Meyers
> Florida Bar No. 0026566
> john.meyers@btlaw.com
> Wm. David Cornwell, Sr.
> *Pro hac vice* application to be filed
> david.cornwell@btlaw.com
> BARNES & THORNBURG LLP
> 3475 Piedmont Road, NE, Suite 1700
> Atlanta, Georgia 30305
> Telephone: 404.846.1693
> Facsimile: 404.264.4033
> *Attorneys for Defendant Jameis Winston*

## CERTIFICATE OF SERVICE

In accordance with Rule 5 of the Federal Rules of Civil Procedure and the CM/ECF Administrative Procedures of the Middle District of Florida, I hereby certify that on May 8, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Notice of this filing will be sent to the following CM/ECF participants by operation of the Court's electronic filing system:

> David B. King
> Thomas A. Zehnder
> Taylor F. Ford
> King, Blackwell, Zehnder & Wermuth, PA
> PO Box 1631
> Orlando, FL 32802-1631
> dking@kbzwlaw.com
> tzehnder@kbzwlaw.com
> tford@kbzwlaw.com

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

> John Clune
> Baine Kerr
> Lauren E. Groth
> Hutchinson Black and Cook, LLC
> 921 Walnut Street, Suite 200
> Boulder, CO 80302
> clune@hbcboulder.com
> kerr@hbcboulder.com
> groth@hbcboulder.com

Respectfully submitted this 8th day of May, 2015.

By: _____/s/ John F. Meyers_____
John F. Meyers