## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**ERICA KINSMAN,**

       **Plaintiff,**

**v.**                                          **Case No:   6:15-cv-696-Orl-22GJK**

**JAMEIS WINSTON,**

       **Defendant.**

---

### ORDER

### I.  INTRODUCTION

By means of this lawsuit based on diversity jurisdiction, Plaintiff Erica Kinsman sues former Florida State University (FSU) quarterback (and now National Football League player) Jameis Winston for sexual battery, assault, false imprisonment, and intentional infliction of emotional distress.  In plain terms, Ms. Kinsman accuses Mr. Winston of forcibly raping her.  Mr. Winston denies the allegation; he claims he and Ms. Kinsman had consensual sex.[1]   In turn, Mr. Winston has asserted counterclaims of defamation *per se*, general defamation, and tortious interference with prospective business advantage.

Ms. Kinsman seeks dismissal of Mr. Winston's counterclaims on several grounds.  Additionally, she seeks an order striking four of his affirmative defenses and an unusual "Preliminary Statement" preceding the answer section of his pleading.   Upon carefully considering the parties' submissions and the relevant law, the Court determines that Mr. Winston's defamation claims survive the motion to dismiss.   However, his tortious interference claim must

---

[1] Of course, this Court expresses no view regarding whose version of events is true.

be dismissed.   Additionally, the Court will strike the "Preliminary Statement" and two of Mr. Winston's defenses, and will require Mr. Winston to re-plead in proper form.

## II.   THE ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

The gravamen of Mr. Winston's 63-page answer, affirmative defenses and counterclaims is that, well aware of Mr. Winston's economic potential as a professional athlete, Ms. Kinsman has levied a false charge of rape for the purpose of damaging Mr. Winston's reputation and coercing him into paying her a substantial sum of money.

As a prelude to the answer portion of his pleading, Mr. Winston has included a remarkable 16 1/2 page narrative (the "Preliminary Statement") that Ms. Kinsman's attorneys characterize as "fall[ing] somewhere between an improperly hostile closing argument at trial and a posting on a Florida State football blog."   (Pl.'s Mot. to Dismiss (Doc. No. 28) (hereinafter, "Pl.'s Mot.") 19.)

Following his actual answer to the complaint, Mr. Winston asserts the following affirmative defenses:   (1) the complaint fails to state a claim for relief; (2) Ms. Kinsman "consented to and was a willing participant in the acts alleged and her claims are barred by consent;" (3) res judicata; (4) collateral estoppel; (5) waiver, laches and unclean hands; (6) Ms. Kinsman's claims "are barred by [her] own conduct;" and (7) failure to exhaust administrative remedies.   (Def.'s Answer, Affirmative Defenses [and] Counterclaims (Doc. No. 7) (hereinafter, "Def.'s Answer") 40-41.)   Additionally, Mr. Winston's eighth and ninth "affirmative defenses" purport to reserve the right to raise additional defenses and claims.   (Def.'s Answer 41.)

In the counterclaim section of his pleading, Mr. Winston alleges that Ms. Kinsman made the following defamatory statements (the "False Statements"):   (1) on January 10, 2013, she

reported to the Tallahassee Police Department that Mr. Winston had raped her;[2] (2) on an unspecified date in January 2013, she made the same statement to an FSU counselor; (3) on November 21, 2013, she reported the rape allegation to an investigator with the State Attorney's Office; (4) on December 13, 2013, one day before Mr. Winston received the 2013 Heisman Trophy in New York City, Ms. Kinsman again stated, this time through her attorney, that Mr. Winston had raped her; (5) on May 19th and 20th, 2014, in connection with an FSU Code of Conduct complaint and hearing regarding two of Mr. Winston's teammates, Ms. Kinsman again asserted that Mr. Winston had raped her; (6) on August 6, 2014, Ms. Kinsman told FSU official Sarah Mirkin that Mr. Winston had raped her; (7) on December 2nd and 3rd, 2014, Ms. Kinsman lied under oath at Mr. Winston's FSU Code of Conduct hearing by testifying that Mr. Winston had raped her; (8) in March 2015, Ms. Kinsman appeared in a documentary film titled "The Hunting Ground" and repeated the rape accusation; and (9) at "various times" Ms. Kinsman, "acting through her attorneys and other advisors," leaked information to various media outlets, including Vice Sports, which published an article on its website on December 31, 2014.[3]   (Def.'s Answer ¶ 44a.-.j.)

Mr. Winston's tortious interference count is founded on the proposition that "[b]y making the False Statements, Ms. Kinsman intentionally and unjustifiably interfered with the relationships between Mr. Winston and the NFL teams considering drafting him, and Mr. Winston and the corporations and organizations considering entering into endorsement deals with him."   (Def.'s

---

[2] The counterclaim asserts that even before January 2013, Ms. Kinsman identified Mr. Winston as her rapist.   In that regard, the counterclaim alleges:   "On December 7, 2012 and on multiple occasions thereafter, Ms. Kinsman told her friends and family that Mr. Winston raped her."   (Def.'s Answer ¶43.)

[3] The counterclaim includes these "leaks" among the listed "False Statements," but it does not specify what defamatory information they contained; presumably, they repeated the claim that Mr. Winston raped Ms. Kinsman.

Answer ¶ 79.)   "Upon information and belief," Mr. Winston claims Ms. Kinsman "repeated her

False Statements with the specific intent of causing immediate injury to Mr. Winston thereby

enhancing her ability to coerce Mr. Winston into paying her off to silence her and, thereby,

preserve his prospective business relationships and his future earnings."   (Def.'s Answer ¶ 77.)

Mr. Winston further alleges that "Ms. Kinsman knew that her allegations would substantially harm

Mr. Winston and his professional prospects, but that he likely would still sign some form of NFL

contract and earn sufficient salary and other income to 'pay her off.'"   (Def.'s Answer ¶ 81.)

## III.   ANALYSIS

Ms. Kinsman seeks dismissal of Mr. Winston's counterclaims on several grounds.   First,

she argues that all of her allegedly defamatory statements are covered by Florida's "single

publication rule," with the result that Mr. Winston's defamation counterclaims are time-barred

under the applicable two-year statute of limitations.   Second, Ms. Kinsman asserts that since the

tortious interference claim is based on the allegedly defamatory statements, Mr. Winston cannot

accomplish an "end run" around the two-year statute of limitations by recasting his defamation

claims as a separate tort with a longer limitations period. Third, Ms. Kinsman contends that her

allegedly defamatory reports to law enforcement personnel and university officials are

conditionally privileged as a matter of law.[4]   Fourth, invoking the *Noerr-Pennington* doctrine,[5]

---

[4] To the extent Ms. Kinsman contends the conditional privilege also applies to her statements to the media and other non-governmental parties, the Court summarily rejects that argument.   *See Fridovich v. Fridovich*, 598 So.2d 65, 69 n.8 (Fla. 1992) (emphasizing that qualified privilege covering statements to police or prosecutor does not apply to defamatory statements made to private individuals).

[5] The *Noerr-Pennington* doctrine is derived from *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

Ms. Kinsman maintains that her allegedly defamatory statements constitute immunized protected speech under the Petition Clause in the First Amendment to the U.S. Constitution.

Further, Ms. Kinsman asks the Court to strike, as impertinent, scandalous and immaterial, the "Preliminary Statement" preceding Mr. Winston's actual answer.   Finally, Ms. Kinsman seeks an order striking Mr. Winston's sixth, seventh, eighth and ninth affirmative defenses (respectively, "Plaintiff's own conduct," failure to exhaust administrative remedies, and the purported reservations of claims and defenses) on the ground that they are facially invalid.

The Court will separately address each of these arguments.

### A.   Single Publication Rule and Statute of Limitations

Neither party disputes that defamation claims are generally subject to a two-year statute of limitations.   *See* Fla. Stat. § 95.11(4)(g).   As previously noted, the counterclaim alleges that Ms. Kinsman told her friends and family on December 7, 2012 that Mr. Winston had raped her (Def.'s Answer ¶ 43.)   Additionally, the earliest statement expressly characterized as one of the actionable "False Statements" in the counterclaims is Ms. Kinsman's report of rape to a Tallahassee police investigator on January 10, 2013.   (Def.'s Answer ¶ 44.a.)   Ms. Kinsman filed the present lawsuit in state court on April 16, 2015.   (Notice of Removal (Doc. No. 1) 1.)   Because Mr. Winston did not sue within two years of these earliest defamatory statements, Ms. Kinsman maintains that the defamation claims are time-barred.

The linchpin of Ms. Kinsman's limitations argument is Florida's single publication rule. This rule is codified in a pair of Florida Statutes, namely, sections 770.05 and 770.07.   The former statute provides:

> No person shall have more than one choice of venue for damages for libel or slander, invasion of privacy, or any other tort founded upon any single publication, exhibition, or utterance, such as any one edition of a newspaper, book, or magazine, any one presentation to an audience, any one broadcast over radio or television, or any one exhibition of a motion picture.  Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

Fla. Stat. § 770.05.   The latter statute, section 770.07, states:   "The cause of action for damages founded upon a single publication or exhibition or utterance, as described in s. 770.05, shall be deemed to have accrued at the time of the first publication or exhibition or utterance thereof in this state."   Fla. Stat. § 770.07.   The Supreme Court of Florida has acknowledged that "chapter 770 primarily addresses media defendants;" nevertheless, that court held that section 770.07 applies "to all civil litigants, both public and private, in defamation actions."   *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So.2d 113, 115 (Fla. 1993).   Hence, if the single publication rule fits this case, Mr. Winston's defamation claims are time-barred.

The fatal flaw in Ms. Kinsman's argument is that it ignores the unassailable fact that Mr. Winston's defamation claims are not based on "any single publication, exhibition, or utterance," as described in sections 770.05 and 770.07.   Rather, Ms. Kinsman is alleged to have made a number of separate defamatory statements to several different kinds of audiences (among them, the police, the State Attorney's Office, FSU, various media outlets, and her friends and family) over a time period spanning December 2012 to March 2015.   This is not a case involving a single publication repeated multiple times.   Rather, Ms. Kinsman allegedly made separate defamatory statements to different audiences on numerous occasions.   By logical and legal measure, her allegedly defamatory statements must be categorized as multiple publications.   *Cf. Musto v Bell South Telecomms. Corp.*, 748 So.2d 296, 298 (Fla. 4th DCA 1999) (multiple publication rule

applies in determining when statute of limitations commences on credit slander claim, since "liability for credit defamation begins anew and a new cause of action accrues each time a credit report is disseminated to a potential creditor").[6]   Accordingly, Florida's single publication rule does not apply to the alleged facts of this case.   Consider the absurdity if it did apply.   Assuming, as this Court must at this stage, that Ms. Kinsman's rape accusations are false, application of the single publication rule would mean that two years after her first defamatory statements, Ms. Kinsman would be free to shout from the rooftops for the rest of her life that Mr. Winston is a rapist, without fear of legal consequence.   That cannot be the law.

Moreover, even if Mr. Winston's defamation claims would ordinarily be time-barred by the combined effect of the single publication rule and the two-year limitations period, Mr. Winston's counsel correctly note that those claims would be excepted from the statute of limitations because they are compulsory counterclaims seeking recoupment of money damages. Under Florida law, "'a compulsory counterclaim in recoupment permits the recovery of an affirmative judgment even though barred as an independent cause of action by the running of the statute of limitations.'"   *Allie v. Ionata*, 503 So.2d 1237, 1239 (Fla. 1987) (quoting *Cherney v. Moody*, 413 So.2d 866, 869 (Fla. 1st DCA 1982)).   The rationale for this rule is that "once a party files an affirmative action, he cannot thereafter profess to be surprised by or prejudiced by affirmative defenses or compulsory counterclaims that stem from that action."   *Id.* at 1240.

"To qualify as a claim for recoupment, the damages claimed by defendant must flow from the same contract as that relied on by the plaintiff, or must grow out of the same transaction as that

---

[6] *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So.2d 113 (Fla. 1993), is distinguishable.   That case involved a single defamatory publication and the issue presented was whether the discovery rule should apply in determining when a defamation claim accrues for limitations purposes.

on which the plaintiff's cause of action is founded." *Ioselev v. Schilling*, No. 3:10-cv-1091-J-34MCR, 2013 WL 271711 at \*5 (M.D. Fla. Jan. 24, 2013) (internal quotation marks omitted). "Although the majority of Florida cases in this area involve recoupment claims asserted in contract disputes, the availability of recoupment as a defense or counterclaim does not appear to be limited to those seeking to reduce the plaintiff's recovery pursuant to a contract." *Id.* "In essence, if a defendant's counterclaim is compulsory, as opposed to permissive, the statute of limitations does not bar its assertion (against a claim for money damages) in the defensive posture." *Id.*

This Court concludes that Mr. Winston's defamation counterclaims are compulsory under both Federal and Florida law. Under Florida law, "a counterclaim is compulsory when it arises out of the same transaction or occurrence as the claim it is countering." *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1301 (11th Cir. 2002) (citing *Londono v. Turkey Creek, Inc.*, 609 So.2d 14, 19 (Fla. 1992)). Under Federal law, a compulsory counterclaim is one that (1) "at the time of its service . . . the pleader has against an opposing party;" (2) "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim;" and (3) "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1)(A), (B). In assessing whether a counterclaim is compulsory, the Eleventh Circuit applies the "logical relationship" test. *Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985). "Under this test, there is a logical relationship when the same operative facts serve as the basis for both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Id.* (internal quotation marks omitted).

These requirements are satisfied in the present case. Both Ms. Kinsman's claims and Mr. Winston's defamation counterclaims center on the same occurrence:    the alleged rape.

Unquestionably, there is a logical relationship between Ms. Kinsman's claims (that Mr. Winston

raped her) and Mr. Winston's defamation counterclaims (that he did not and that she is fabricating

her accusation to damage his reputation and extort money from him).[7]   In fact, the claims and the

defamation counterclaims are inextricably intertwined.   Under these circumstances, the Court

determines that Mr. Winston's defamation counterclaims are not time-barred.[8]

### B.   Single Action Rule as Applied to Tortious Interference Claim

Even though the single publication rule does not bar Mr. Winston's defamation claims, the

related "single action rule" does preclude his tortious interference claim.

Florida's single action rule prohibits defamation claims from being re-cast as additional,

separate torts, e.g., intentional infliction of emotional distress, if all of the claims arise from the

same defamatory publication.   *Tobinick v. Novella*, No. 9:14-CV-80781, 2015 WL 328236 at *11

---

[7] It is unnecessary to reach the issue of whether the tortious interference counterclaim is compulsory based on the Court's conclusion, discussed next, that the tortious interference claim is barred by the single action rule.

[8] *Londono v. Turkey Creek, Inc.*, 609 So.2d 14 (Fla. 1992), is distinguishable.   In *Londono*, the issue was whether a slander of title claim was barred because it should have been raised as a compulsory counterclaim in a prior lawsuit.   Notably, some of the activity that constituted alleged slander of title occurred after the first lawsuit was filed.   609 So.2d at 15-16 (noting that first lawsuit was filed in March 1982 and second suit was based on conduct that allegedly occurred from early 1982 through May 1984).   Deciding that the two lawsuits were "separate controversies with distinct and unrelated facts," the Supreme Court of Florida ruled that the subsequent "slander of title action was not a compulsory counterclaim" that must have been raised in the first action.   *Id.* at 20.

*Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453 (11th Cir. 1985), is also inapposite.   As in *Londono*, the issue in *Republic Health* was whether claims asserted in a second lawsuit should have been brought as compulsory counterclaims in a prior suit.   The Eleventh Circuit determined that the complaint in the first lawsuit "focused on a narrow issue," while the complaint in the second suit was much broader, "contain[ing] a wide range of allegations" that went "far beyond the discrete issue" the first tribunal was asked to decide.   755 F.2d at 1455.   Accordingly, the appellate court held that there was not a "sufficient logical relationship" between the two suits to warrant the conclusion that the claims in the second suit were compulsory counterclaims.   *Id.*

(S.D. Fla. Jan. 23, 2015). In other words, "[w]hen claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event." *Id.* (quoting *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014)) (alteration added). "Under these circumstances, courts have dismissed the offending counts." *Id.* (citing *Klayman*, 22 F. Supp. 3d at 1255-57). The underlying rationale is that all of the "injuries resulting from [a single publication] are merely items of damage arising from the same wrong." *Id.* (quoting *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 208 (Fla. 4th DCA 2002)) (alteration added).

Ms. Kinsman maintains that the tortious interference claim is "expressly premised" on the same assertedly "False Statements" supporting the defamation counts. (Pl.'s Mot. 9.) She argues that because the defamation claims are barred by the two-year statute of limitations (an argument the Court has now rejected), Mr. Winston cannot accomplish an "end run" around that time bar by re-characterizing his claims as a separate tort subject to a longer statute of limitations. (Pl.'s Mot. 9.) On this basis, Ms. Kinsman argues that the tortious interference claim must be dismissed pursuant to the single action rule. (Pl.'s Mot. 9-12.)

Mr. Winston counters that the rule only bars additional, separate torts such as tortious interference when the related defamation claim suffers from some defect that requires its dismissal. (Def.'s Opp'n to Pl.'s Mot. (Doc. No. 32) (hereinafter, "Def.'s Opp'n") 10.) Mr. Winston relies on cases stating that the rule is designed to prevent a plaintiff from circumventing a valid defense to defamation by pleading several different causes of action arising from the same facts and resulting in the same harm. (Def.'s Opp'n 10) (citing *Callaway*, 831 So.2d at 208.) Mr. Winston maintains that because his defamation claims are not subject to dismissal, the single action rule

does not apply.   (Def.'s Opp'n 10.)   Finally, Mr. Winston argues that he has not simply "recast"

his defamation counts as a tortious interference claim.   (Def.'s Opp'n 10.)   He maintains that he

has alleged "separate facts and circumstances" in his tortious interference count, so the tortious

interference count should be viewed as a viable tort claim, independent of his defamation claims.

(Def.'s Opp'n 10-11.)

The Court acknowledges that some Florida decisions contain language suggesting that the

single action rule bars non-defamation torts only when they are associated with a failed defamation

claim.   *See, e.g., Callaway*, 831 So.2d at 208 ("The single publication/single action rule . . . does

not permit multiple actions when they arise from the same publication upon which a failed

defamation claim is based."); *Ovadia v. Bloom*, 756 So.2d 137, 141 (Fla. 3d DCA 2000) ("the

single publication/single action rule does *not* permit multiple actions to be maintained when they

arise from the same publication upon which a failed defamation claim is based.")   However, other

decisions applying Florida law have rejected non-defamations torts by applying the single action

rule even when related defamation claims were allowed to proceed.   *See, e.g., Klayman*, 22 F.

Supp. 3d at 1257 (determining that claims of tortious interference with contract and intentional

infliction of emotional distress were barred under single action rule even though defamation count

survived summary judgment); *Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339-40

(S.D. Fla. 1998) (dismissing false light invasion of privacy claim based on single action rule even

though defamation claims survived dismissal and summary judgment).

In *Tobinick v. Novella*, Judge Rosenberg of the Southern District of Florida confronted this

apparent split of authority and elected to follow the rule that non-defamation tort claims based on

a defamatory statement are barred regardless of whether the defamation claim fails.   *Tobinick v.*

*Novella*, No. 9:14-CV-80781, 2015 WL 328236 at *11 n.17 (S.D. Fla. Jan. 23, 2015) (citing

*Klayman* and quoting *Fridovich v. Fridovich,* 598 So.2d 65, 70 (Fla. 1992) ("In short, *regardless of privilege*, a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous'")).   The undersigned judge agrees with Judge Rosenberg on this point.   The fact that the Court has ruled that Mr. Winston's defamation claims may proceed does not insulate his tortious interference claim from dismissal under the single action rule.

Moreover, the Court rejects Mr. Winston's argument that his tortious interference count is legally independent from his defamation claims.   The tortious interference count is based squarely on the alleged defamatory statements.   Throughout the tortious interference count, Mr. Winston refers repeatedly to the "False Statements," and the allegations in that count make abundantly clear that he contends it is the "False Statements" that have injured his professional reputation and his prospective business relationships.   (*See* Def.'s Answer ¶¶ 77, 78, 79, 80, & 81.)   In reality, the alleged harms about which Mr. Winston complains in his tortious interference count are consequences flowing from the alleged defamatory statements.   For that reason, they are redressable through his defamation claims if he prevails on those claims and proves damages.

Based on the foregoing reasoning, the Court concludes that Mr. Winston's tortious interference count must be dismissed under the single action rule.

## C.   Qualified Privilege

The Supreme Court of Florida has held that "defamatory statements voluntarily made by private individuals to the police or the state's attorney prior to the institution of criminal charges are presumptively qualifiedly privileged." *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992) (footnote omitted). To overcome a qualified privilege, a plaintiff must "establish by a preponderance of the evidence that the defamatory statements were false and uttered with common

law express malice – i.e., that the defendant's primary motive in making the statements was the intent to injure the reputation of the plaintiff."   *Id.*; *DelMonico v. Traynor*, 116 So.3d 1205, 1215 (Fla. 2013) (quoting *Fridovich*).

Ms. Kinsman argues that her statements to the police, prosecutors and university officials are qualifiedly privileged as a matter of law because the circumstances surrounding her statements are "undisputed or unquestionably clear."   (Pl.'s Mot. 13-14.)   The short answer to this assertion is that Mr. Winston's counterclaims are replete with allegations of malice, ill will and extortion. At this stage in the litigation, the Court is legally obligated to accept those allegations as true. This compels denial of the motion to dismiss on this point.

### D.   *Noerr-Pennington* Immunity

Invoking the *Noerr-Pennington* doctrine, Ms. Kinsman asserts that her reports to law enforcement and university disciplinary officers were immunized petitioning activity under the First Amendment to the U.S. Constitution.   (Pl.'s Mot. 14-18.)

The *Noerr-Pennington* doctrine has its origins in federal antitrust law.   The Eleventh Circuit has summarized the doctrine as follows:

> Recognizing that the First Amendment guarantees the right to petition the Government for a redress of grievances, and that this guarantee overrides the effect of a contrary federal statute, and not wanting to impute to Congress an intent to invade the First Amendment right to petition, the Supreme Court has held that a defendant is immune from Sherman Act liability for concerted efforts to petition government to pass legislation which has the effect of restraining or monopolizing trade in favor of the defendant.

*Andrx Pharms, Inc. v. Elan Corp.,* 421 F.3d 1227, 1233 (11th Cir. 2005) (internal quotation marks and citations omitted).   "Subsequent precedent has extended *Noerr–Pennington* immunity to

defendants who exercise their right to petition government by resorting to administrative and/or judicial proceedings." *Id.*

"An exception to the *Noerr–Pennington* doctrine exists, however, where the defendant engages in 'sham litigation.'" *Id.* To demonstrate that the sham litigation exception applies, "a litigant must establish that: (1) 'the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; and (2) the party bringing the allegedly baseless suit did so with a 'subjective motivation . . . to interfere *directly* with the business relationships of a competitor.'" *Id.* at 1234 (quoting *Prof'l Real Estate Inv'rs v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)).

However, *Noerr-Pennington* does not immunize petitioning activity consisting of false statements made to the government.[9] *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 955 (11th Cir. 1986) (stating that misrepresentations to a government agency do not enjoy *Noerr-Pennington* immunity); *see also, Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) ("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods."); *Liberty Lake Invs., Inc. v. Magnuson,* 12 F.3d 155, 159 (9th Cir. 1993) (suggesting that two-part sham litigation test would not apply upon "proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.").

Mr. Winston's defamation counterclaims are premised on the allegation that Ms. Kinsman's reports of rape were false. Once again, the Court observes that it must accept those allegations as true at the motion to dismiss stage. Accordingly, *assuming for present analytical*

---

[9] A contrary rule would eviscerate state law defamation liability as a remedy for victims of false crime reports to the police and prosecutors.

*purposes that the Noerr-Pennington doctrine applies to state law defamation claims brought in a diversity suit*,[10] Ms. Kinsman is not entitled to dismissal of the defamation counterclaims on the basis of *Noerr-Pennington*.[11]

The same result flows from Florida law.  The Supreme Court of Florida has rejected the federal "sham" exception on the ground that Florida law adequately protects the First Amendment right to petition the government.  *Londono v. Turkey Creek, Inc.*, 609 So.2d 14, 18 (Fla. 1992); *see Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*, 616 So.2d 562, 565-570 (Fla. 5th DCA 1993) (discussing *Noerr-Pennington* and *Londono*).   In Florida, that protection is afforded through conditional privilege.  As stated in *Londono*, "One who publishes defamatory material concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused."  609 So.2d at 18 (quoting Restatement (Second) of Torts § 593 (1976)); *see Fla. Fern Growers*, 616 So.2d at 569 (quoting *Londono*).   As previously stated, Mr. Winston's defamation counterclaims allege sufficiently egregious conduct that the Court cannot find as a matter of law at the dismissal stage that Ms. Kinsman's statements were privileged.

---

[10] Much more thorough briefing, presumably at the summary judgment stage, will be necessary to convince the Court that *Noerr-Pennington* has even theoretical application to this kind of case.   In the context of the present dispute, the doctrine seems entirely superfluous.   As previously noted, *Noerr-Pennington* does not immunize false statements.   So, if Ms. Kinsman's rape reports were false, as Mr. Winston contends, *Noerr-Pennington* does not apply.   On the other hand, if the fact-finder determines that Ms. Kinsman's rape allegations are true, she cannot be found to have committed defamation and will have no need for *Noerr-Pennington* immunity.

[11] Ms. Kinsman argues that the statements she made to non-government audiences, which she characterizes as "associated communications," are also immunized by *Noerr-Pennington*.  (Pl.'s Mot. 17.)   If these statements to the media and other third parties can somehow also be considered a form of First Amendment petitioning activity, Mr. Winston's allegations that these statements were false precludes dismissal on the basis of *Noerr-Pennington*.

### E.   Mr. Winston's "Preliminary Statement"

The un-numbered 16 1/2 page "Preliminary Statement" that precedes Mr. Winston's actual answer to the complaint is an argumentative, free-flowing narrative that attacks Ms. Kinsman and her version of events.   Frankly, it reads like a closing argument.   It was obviously penned more for the consumption of the court of public opinion than for this Court and the other participants in this case.   The Court cannot recall ever seeing such a remarkable and improper introduction to an answer.   Structurally and legally, it is not a part of Mr. Winston's answer and it has no place in his pleading.   Accordingly, the Court will strike the "Preliminary Statement" and will require Mr. Winston to re-plead his answer in proper form.

### F.   Mr. Winston's Affirmative Defenses

The Court will deny Ms. Kinsman's motion insofar as it seeks to strike Mr. Winston's sixth and seventh affirmative defenses (respectively, "Plaintiff's own conduct" and "failure to exhaust . . . administrative remedies").   (Def.'s Answer 41.)   Those affirmative defenses are not so deficient that they warrant being stricken.   However, the eighth and ninth "affirmative defenses," which purport merely to reserve the right to assert further defenses and claims, are not defenses at all.   Accordingly, those "affirmative defenses" will be stricken.

### G.   Mr. Winston's Request for Leave to Amend

As previously stated, the Court will require Mr. Winston to re-plead his answer, affirmative defenses and counterclaims in proper form.   In his amended pleading, he shall omit the "Preliminary Statement," his eighth and ninth "affirmative defenses," and his tortious interference counterclaim.   The Court cannot grant Mr. Winston leave to amend his tortious interference counterclaim; since that claim is based squarely on the alleged defamatory statements, leave to

amend would be futile. Accordingly, the tortious interference claim will be dismissed with prejudice.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Plaintiff's Motion to Dismiss Defendant's Counterclaim and Strike Portions of Answer [and] Affirmative Defenses (Doc. No. 28), filed on June 1, 2015 is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED insofar as it seeks dismissal of the tortious interference claim asserted in Count Three of the Counterclaims. That claim is DISMISSED, WITH PREJUDICE. The Motion is also GRANTED insofar as it seeks a ruling striking the "Preliminary Statement" preceding Mr. Winston's answer, as well as the Eighth and Ninth Affirmative Defenses. Those portions of Mr. Winston's pleading are STRICKEN. In all other respects, the Motion is DENIED.

2. Mr. Winston is granted leave to serve and file an amended answer, affirmative defenses, and counterclaims. That pleading shall be filed and served on or before September 25, 2015. When Mr. Winston re-pleads, he shall not re-assert the dismissed tortious interference claim, or the stricken "Preliminary Statement," or the stricken Eighth and Ninth Affirmative Defenses. Additionally, he shall not add any new counterclaims or affirmative defenses.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on September 15, 2015.

ANNE C. CONWAY
United States District Judge

- 18 -

Copies furnished to:

Counsel of Record
Unrepresented Parties